1  Michael P. Scruggs, WSBA No. 19066
2  Colleen A. Lovejoy, WSBA No. 44386
   Schlemlein Fick & Franklin, PLLC
3  66 S. Hanford St, Suite 300
   Seattle, WA 98134
4  P: 206-448-8100
   F: 206-448-8514
5  E: mps@soslaw.com
   E: c.lovejoy@soslaw.com
6  Attorneys for Plaintiff
7

8            **UNITED STATES DISTRICT COURT**
          **WESTERN DISTRICT OF WASHINGTON**
9                    **AT SEATTLE**

10  DAVID DYKHOUSE, derivatively on behalf of
    ZILLOW, INC.                                    Case No.:
11
                     Plaintiff,                     VERIFIED STOCKHOLDER
12                                                  DERIVATIVE COMPLAINT
13         v.                                       **JURY TRIAL DEMANDED**

14  RICHARD BARTON, DAVID BEITEL, ,
    ERIK BLACHFORD, AMY BOHUTINSKY,
15  SUSAN DAIMLER, LLOYD FRINK, JAY
    HOAG, AIMEE JOHNSON, GREGORY
16  MAFFEI, ALLEN W. PARKER, ARIK
    PRAWER, DAN SPALDING, GORDON
17  STEPHENSON, CLAIRE CORMIER
    THEILKE, APRIL UNDERWOOD, and
18  JEREMY WACKSMAN,
19
                     Defendants,
20
           and
21
22  ZILLOW GROUP, INC.,

23                   Nominal Defendant.
24

25

26

27
    **VERIFIED STOCKHOLDER**              Page 1
    **DERIVATIVE COMPLAINT**

## INTRODUCTION

Plaintiff David Dykhouse ("Plaintiff"), by and through his counsel, derivatively on behalf of Nominal Defendant Zillow Group, Inc. ("Zillow" or the "Company"), submits this Verified Stockholder Derivative Complaint against Defendants (as defined herein) and alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which included, *inter alia*, review and analysis of (i) regulatory filings made by Zillow with the United States Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by Zillow; (iii) a review of confidential, non-public documents produced by Zillow in response to Plaintiff's demand for books and records under the Washington Business Corporation Act, RCW 23B.16.020; (iv) court submissions in a consolidated securities class action against certain officers and members of the Company's Board of Directors (the "Board") alleging issuance of false and misleading statements of material fact and the omission of material facts necessary to make other statements made not misleading, between August 5, 2021 and November 2, 2021 (the "Relevant Period") with respect to Zillow's business, operations, and prospects; and (v) other publicly available information concerning Zillow.

## NATURE OF THE ACTION

1.    This is a stockholder derivative action asserted on behalf of Nominal Defendant Zillow against certain officers and the members of the Company's Board. The wrongdoing alleged herein has caused substantial damage to Zillow's reputation, goodwill, and standing in the business community and has exposed Zillow to substantial potential liability for violations of the federal securities laws and the costs associated with defending itself. The violations of the law outlined herein have damaged Zillow in the form of, among other things, millions of dollars in losses to the Company's market capitalization.

2.    Zillow is a real-estate marketplace company that was founded in 2004 and became public in 2011. In its initial public offering ("IPO"), the Company initially issued Class A and

1   unlisted Class B common stock giving each stockholder one vote per share and ten votes per share,

2   respectively. The Company's Class A common stock started trading on NASDAQ under the ticker

3   "Z".

4       3.      In July 2015, the Company announced that the Board had approved a 3-for-1 stock

5   split.  On August 14, 2015, the stock split awarded stockholders two Class C capital stock shares for

6   each share of either Class A or Class B common stock they held.  Subsequently, Class A common

7   stock began trading under the new ticker symbol "ZG," and Class C capital stock began trading

8   under the ticker "Z" in Class A's stead.

9       4.      By 2018 Zillow's stock price had stagnated and the Company needed to reinvent

10  itself under a new business model.  In April 2018, the Company entered the iBuying business.

11      5.      Zillow's new iBuying business, which it called Zillow Offers, provided the Company

12  with a brand-new revenue source to revive its decelerating revenue streams.  Zillow initially

13  launched Zillow Offers in two test markets, and by the end of 2018, Zillow had expanded its iBuying

14  operations to five metropolitan areas.  By 2020, the Company had inserted itself in twenty-five

15  markets.

16      6.      In early 2020, after the COVID-19 pandemic began, the Company paused its Zillow

17  Offers home purchases, slowing its growth trajectory for 2020.  In the fall of 2020, the Company

18  resumed home purchases, and by the second quarter of 2021, Zillow Offers made up roughly 60%

19  of Zillow's total revenues.

20      7.      Unbeknownst to the public, the Company initiated an internal project called "Project

21  Ketchup," designed to rapidly increase home purchases and catch up to competitors in the iBuying

22  market, particularly Opendoor.  The project's name was a play on the words "catch up," reflecting

23  the Company's mission to close the gap with its competitors.

24      8.      As part of this project, Zillow began systematically overriding its own pricing

25  algorithms by applying manual "overlays" to increase offer prices on homes.  These overlays, which

26

27

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

1    could add as much as 7% to a proposed offer, were implemented to boost the number of accepted

2    offers and meet aggressive volume targets.

3    9.    As part of Project Ketchup, Zillow reduced the scope of and budget for renovations.

4    Consequently, the Company was unable to rapidly sell the homes purchased because many

5    contractors began declining jobs and refusing to work for the Company.  As a result, Zillow suffered

6    a renovation inventory backlog of around 1,800 homes and carrying costs drastically increased.

7    10.    In October 2021, Zillow announced that it had paused the purchase of new homes for

8    the remainder of the year in the Zillow Offers division.

9    11.    The market learned the truth on November 2, 2021, when Zillow reported its financial

10   results for the third quarter 2021 announcing that the Company was winding down its Zillow Offers

11   segment over the next several quarters.  The Company admitted that its home valuation process was

12   inadequate and that, as a result, Zillow would be forced to unload thousands of properties at

13   drastically reduced prices.

14   12.    The Individual Defendants (defined below) created a false and misleading impression

15   that the growth of and demand for Zillow Offers was organic and based upon Zillow's frequently

16   discussed and highlighted algorithm and pricing models and that Zillow Offers' favorable margins

17   were the result of durable and sustainable operational and cost improvements.

18   13.    Specifically, the statements made were materially false and misleading because the

19   Individual Defendants (defined below) failed to disclose to investors that (i) between the first and

20   second quarter of 2021 the Company had initiated Project Ketchup in order to accelerate the purchase

21   of homes so that Zillow could achieve its 3 to 5 year projections of purchasing monthly 5,000 homes

22   and achieving $20 billion in revenue; (ii) in an attempt to attain volume goals the Company was

23   overriding the offer prices generated by its algorithm and analysts pricing value models, thereby

24   Zillow was overpaying for homes in order to entice sellers to sell their homes to the Company; (iii)

25   Zillow was reducing the scope of renovations and budget to pay for such renovations and contractors;

26   (iv) as a result of the Company's significantly overpaying for homes and its the renovation cost

27

**VERIFIED STOCKHOLDER
DERIVATIVE COMPLAINT**                    Page 4

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

1  cutting and the squeeze in contractors, it had a backlog causing the houses to sit in inventory longer

2  and increasing carrier costs; and (v) consequently, the Company had to wind-down its inventory and

3  sell the properties at well below purchase price.

4      14.    The Individual Defendants created a false and misleading impression that the growth

5  of and demand for Zillow Offers was organic and based upon Zillow's frequently discussed and

6  highlighted algorithm and pricing models and that Zillow Offers' favorable margins were the result

7  of durable and sustainable operational and cost improvements.

8      15.    As discussed below, █████████████████████████████████

9  ████████████████████████████████████████████████████████████

10 ████████████████████████████ [1] █████████████████████████████

11 ████████████████████████████████████████████████████████████

12 ██████████████████████████

13     16.    ████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████████████

17 ████████████████████████████████████████████████████████████

18 ████████████████████████████████████████████████████████████

19 █████████████

20     17.    Just a few months later in September, ██████████████████████

21 ████████████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████████████

23 ████████████████████████████████████████████████████████████

24

25 _____

26 [1] The redacted portions of this Complaint are confidential pursuant to a confidentiality agreement
   dated April 5, 2022 by and between Zillow and BES as counsel for Plaintiff.

27

**VERIFIED STOCKHOLDER**                Page 5          SCHLEMLEIN FICK & FRANKLIN, PLLC
**DERIVATIVE COMPLAINT**                               66 S. Hanford Street, Suite 300
                                                       Seattle, WA 98134
                                                       P: (206) 448-8100 F: (206) 448-8514

1 ███████████████████████████████████████████████████

2 ████████████████████████████████

3      18.    The Individual Defendants breached their fiduciary duties by failing to correct and/or

4 causing the Company to fail to correct these false and misleading statements and omissions of

5 material fact.  The Individual Defendants also willfully or recklessly caused the Company to fail to

6 maintain an adequate system of oversight, disclosure controls and procedures, and internal controls

7 over financial reporting.

8      19.    As a direct and proximate result of the misconduct described herein by Defendants,

9 Zillow has sustained significant damages as described below.

10                          **JURISDICTION AND VENUE**

11      20.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because

12 Plaintiff's claims raise a federal question under Sections 10(b), 20(a), and 21D of the Securities

13 Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.  The

14 Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. §

15 1367(a) because the state law claims form part of the same case or controversy.  This derivative

16 action is not a collusive one designed to confer jurisdiction on a court of the United States that would

17 not otherwise have such jurisdiction.

18      21.    The Court has personal jurisdiction over the Defendants because they have the

19 requisite minimum contacts with the forum related to the claims asserted and because exercising

20 jurisdiction over Defendants is fair and reasonable. Nominal Defendant Zillow's principal place of

21 business is located in Seattle, Washington, and the Individual Defendants were officers and directors

22 of Zillow at the time that their actions and omissions giving rise to the claims occurred.

23      22.    Venue is proper in this District because the Company is incorporated in this District

24 and the Individual Defendants have been involved in business in this District.  Further, Defendants'

25 actions have had an effect in this District.

26

27

**VERIFIED STOCKHOLDER
DERIVATIVE COMPLAINT**
                          Page 6

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

**PARTIES**

1

2    23.    Plaintiff David Dykhouse is a stockholder of Zillow and has continuously held Zillow

3    stock from the time of the wrongdoing alleged herein until the present.  Plaintiff will fairly and

4    adequately represent Zillow's interest in this action.

5    24.    Nominal Defendant Zillow is incorporated under the laws of the State of Washington,

6    and its principal executive offices are located in Seattle, Washington.  Zillow's common stock trades

7    on the NASDAQ exchange under the symbol "ZG."

8    25.    Defendant Richard Barton ("Barton") is Zillow's Co-Founder and has served as a

9    member of the Board since December 2004.  He previously served as Zillow's Chief Executive

10   Officer ("CEO") from 2004 until 2010, as its Executive Chairman from 2010 until 2019, and as its

11   CEO from February 2019 until August 2024.

12   26.    Defendant David Beitel ("Beitel") has served as the Company's Chief Technology

13   Officer ("CTO") since February 2005.

14   27.    Defendant Erick Blachford ("Blachford") has served as a member of the Board since

15   May 2005.  He has served as a member of the Nominating and Governance Committee ("Governance

16   Committee") since 2015.

17   28.    Defendant Amy Bohutinsky ("Bohutinsky") has served as a member of the Board

18   since October 2018.  Since 2022, she has been a member of the Governance Committee, and she has

19   also been a member of the Compensation Committee since 2022.

20   29.    Defendant Susan Daimler ("Daimler") has served as President of Zillow since

21   February 2021.

22   30.    Defendant Lloyd Frink ("Frink") is Co-Founder of Zillow and has served as a

23   member of the Board since 2004 and as its Chair since February 2019.  He has served in multiple

24   leadership positions, including Treasurer and Chief Strategy Officer.

25   31.    Defendant Jay Hoag ("Hoag") has served as a member of the Board since October

26   2005.

27

**VERIFIED STOCKHOLDER
DERIVATIVE COMPLAINT**

Page 7

32.     Aimee Johnson ("Johnson") served as the Company's Chief Marketing Officer from November 2018 to September 2022.

33.     Defendant Gregory Maffei ("Maffei") has served as a member of the Board since May 2005.  He has served as Chair of the Audit Committee since at least 2015.

34.     Defendant Allen W. Parker ("Parker") served as the Company's Chief Financial Officer ("CFO") from November 2018 until February 2024.

35.     Defendant Arik Prawer ("Prawer") served as President of the Company's Homes Division from February 2018 to December 2023.

36.     Defendant Dan Spalding ("Spalding") has served as the Company's Chief People Officer since 2016.

37.     Defendant Gordon Stephenson ("Stephenson") has served as a member of the Board since May 2005.  He has served as a member of the Audit Committee since 2016 and a member of the Governance Committee since 2015.

38.     Defendant Claire Cormier Thielke ("Thielke") has served as a member of the Board since October 2020.  She has served as a member of the Audit Committee since 2021.

39.     Defendant April Underwood ("Underwood") has served as member of the Board since February 2017.

40.     Defendant Jeremy Wacksman ("Wacksman") has served as the Company's CEO since August 2024.  Wacksman joined Zillow in 2009.  He previously served as the Company's Vice President, Marketing and Product Management from 2009 to 2015; its Chief Marketing Officer from 2015 to 2018; its President from December 2019 to February 2021; and its Chief Operating Officer ("COO") from February 2021 until August 2024.

41.     Relevant Non-Party William Gurley ("Gurley") has served as a member of the Board since January 2024.

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

42.     The following defendants are hereinafter referred to as the "Individual Defendants": Barton, Beitel, Blachford, Bohutinsky, Daimler, Frink, Hoag, Johnson, Maffei, Parker, Prawer, Spalding, Stephenson, Thielke, Underwood, and Wacksman.

43.     The following Individual Defendants are collectively referenced herein as the "Director Defendants":  Barton, Blachford, Bohutinsky, Frink, Hoag, Maffei, Stephenson, Thielke, and Underwood.

44.     The following Individual Defendants are collectively referenced herein as the "Officer Defendants":  Barton, Beitel, Daimler, Johnson, Parker, Prawer, Spalding, and Wacksman.

45.     The following Individual Defendants are collectively referred to herein as the "Audit Committee Defendants":  Maffei (Chair), Thielke, and Stephenson.

46.     The following Individual Defendants are collectively referred to herein as the "Governance Committee Defendants":  Blachford and Stephenson (Chair).

47.     The following Individual Defendants are collectively referenced herein as the "Securities Class Action Defendants":  Barton, Parker, and Wacksman.

### THE INDIVIDUAL DEFENDANTS OWE FIDUCIARY DUTIES TO THE COMPANY AND ITS STOCKHOLDERS

48.     At all times relevant to this case, the conduct of the Individual Defendants was governed by well-recognized rules to protect the Company and its stockholders, the members of the public who had invested in Zillow.

49.     By reason of their positions as officers and/or directors of the Company and their ability to control its business and corporate affairs, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.

50.     The Individual Defendants were required to act in furtherance of the best interests of the Company and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

51.     Each of the Company's directors owed to the Company and its stockholders fiduciary duties of care and loyalty, including good faith, oversight, and candor, to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

52.     Because of their positions of control and authority as directors and/or officers of the Company, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts alleged herein.

53.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Zillow were required to do the following:

- Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

- Conduct the affairs of the Company in a lawful, efficient, and business-like manner to make it possible for the Company to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

- Properly and accurately inform investors and analysts as to the true financial condition of the Company at any given time, make accurate statements about the Company's financial results and prospects, and ensure that the Company

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

- Remain informed as to how the Company conducted its operations, and, upon notice of imprudent or unsound conditions or practices, make reasonable inquiry into the nature and cause of such conditions and practices, correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws; and

- Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

54. The Individual Defendants knowingly violated their obligations as directors and/or officers of the Company, acting without good faith and consciously disregarding their duties to the Company and its stockholders despite their knowledge of the risk of serious injury to the Company.

55. Because of their positions of control and authority, the Individual Defendants were able to exercise control over the wrongful acts complained of herein as well as the contents of the various public statements issued by Zillow.

56. The Zillow Board has adopted Zillow's Code of Conduct to deter wrongdoing, which imposed additional duties and responsibilities on the Director Defendants and the Officer Defendants during the Relevant Period, including the following:

- Endeavor to deal honestly, ethically and fairly with the Company's consumers, customers, suppliers, competitors and employees. Statements regarding the Company's products and services must not be false, misleading, deceptive or fraudulent.

- No person subject to this Code may take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice.

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

Page 11

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

- Every person subject to this Code is expected to use good judgment and common sense in seeking to comply with all applicable laws, rules and regulations and to ask for advice from the General Counsel when uncertainties arise.

- If any person subject to this Code becomes aware of the violation of any law, rule or regulation by the Company, whether by its officers, employees, directors, or any third party doing business on behalf of the Company, it is such person's responsibility to follow the guidelines described in the Reporting and Compliance Procedures section below to promptly report the matter to such person's supervisor or the General Counsel or, if you are an executive officer or director, to the Chair of the Nominating and Governance Committee of the Board of Directors of Zillow Group, Inc.

- Employees, officers and directors who are in possession of material non-public information about the Company or other companies, including the Company's suppliers and customers, as a result of their relationship with the Company are prohibited by law and Company policy from trading in securities of the Company or such other companies, as well as from communicating such information to others who might trade on the basis of that information.  To assist with compliance with laws against insider trading, the Company has adopted a detailed Insider Trading Policy.

- The Company files reports and other documents with regulatory authorities, which may include the United States Securities and Exchange Commission and NASDAQ.  The Company may make other public communications, such as issuing press releases.  All information provided in the Company's public reports and communications must be complete, fair, accurate, timely and understandable, and must also comply with applicable laws, rules and

regulations. Employees, officers and directors who are asked to provide information for the Company's public disclosures must use all reasonable efforts to provide complete, fair, accurate, timely and understandable information.

- If any person subject to this Code becomes aware of any information concerning (a) material defects in the disclosures made by the Company in its public filings; (b) significant deficiencies in the design or operation of internal controls; (c) any violation of this Code that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls; or (d) any material violation of the law or this Code, you should follow the guidelines described in the Reporting and Compliance Procedures section.

- In connection with its public communications, the Company is required to comply with Regulation FD (Fair Disclosure) under the federal securities laws. Regulation FD provides that when the Company discloses material, non-public information about it to securities market professionals or shareholders (where it is reasonably foreseeable that the shareholders will trade on the information), the Company must also disclose the information to the public. You are required to read carefully and comply with the Company's Policy and Procedures for Public Disclosures and Communications with Analysts, Investors and Media.

- Every person subject to this Code has the responsibility to ask questions, seek guidance, report suspected violations and express concerns regarding compliance with this Code. Any person subject to this Code who knows or believes that any other employee or representative of the Company has engaged or is engaging in Company-related conduct that violates applicable

law or this Code should report such violation to at least one of the following contacts: Human Resources, General Counsel, CEO, CFO, Chair of the Governance Committee, and Chair of the Audit Committee.

### DIRECTOR DEFENDANTS ON THE AUDIT COMMITTEES OWE ADDITIONAL DUTIES

57.    The Audit Committee Charter ("Audit Charter") placed additional duties and responsibilities upon the members of the Audit Committee, which consisted of Defendants Maffei (Chair), Thielke, and Stephenson during the Relevant Period.

58.    Per the Audit Charter, the overarching duties of the Audit Committee and its members included the following:

- Prior to filing any periodic report with the SEC, meet with management and the independent auditor to review and discuss the annual audited financial statements (including the report of the independent auditor thereon) and quarterly unaudited financial statements, including in each case the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

- Regularly review with the independent auditor any audit problems or difficulties and management's response, including any restriction on the scope of activities, access to required information, the adequacy of internal controls, adjustments noted or proposed by the independent auditor but not taken (as immaterial or otherwise) by management, communications between the audit team and the national office concerning auditing or accounting issues, and any management or internal control letters issued or proposed to be issued by the auditor.

- If so determined by the Committee, based on its review and discussion of the audited financial statements with management and the independent auditor,

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

its discussions with the independent auditor regarding the matters required to be discussed by statement on Auditing Standard 1301 ("Communications with Audit Committees"), as amended from time to time, and its discussions regarding the auditor's independence, recommend to the Board whether the audited financial statements be included in the Company's annual report on Form 10-K.

- Review earnings press releases, including all quarterly earnings releases and ancillary documents, in advance of their dissemination.  Discuss or review corporate policies with respect to financial information and earnings guidance provided to analysts and rating agencies.

- Obtain and review timely reports from the independent auditor regarding (a) all critical accounting policies and practices to be used, (b) all alternative treatments of financial information within GAAP that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor, and (c) other material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences.

- Review at least annually (a) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies, (b) analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

preparation of the financial statements, and (c) the effect of regulatory and accounting initiatives on the financial statements of the Company.

- Review and discuss with management from time to time the effectiveness of, or any deficiencies in, the design or operation of disclosure controls and procedures or internal controls and any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls.

- Review any report issued by the Company's independent auditor regarding management's assessment of the Company's internal controls.  Discuss policies with respect to risk assessment and risk management, including the Company's major financial risk exposures, including capital, regulatory and other requirements, and data privacy, cybersecurity and other topics related to information technology infrastructure, and the steps management has taken to monitor and control such exposures.

## BACKGROUND

59.     Zillow is a Washington corporation with principal executive offices located in Seattle, Washington.  The Company was founded in 2004 and became public in 2011.  In its IPO, the Company initially issued Class A and unlisted Class B common stock giving each stockholder one vote per share and ten votes per share, respectively.  The Company's Class A common stock started trading on NASDAQ under the ticker "Z".

60.     In July 2015, the Company announced that the Board had approved a 3-for-1 stock split.  On August 14, 2015, the stock split awarded stockholders two Class C capital stock shares for each share of either Class A or Class B common stock they held.  Subsequently, Class A common stock began trading under the new ticker symbol "ZG", and Class C capital stock began trading under the ticker "Z" in Class A's stead.

**VERIFIED STOCKHOLDER
DERIVATIVE COMPLAINT**

Page 16

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

61.    During the Relevant Period, Zillow had three business services: (i) the Homes division's purchasing and selling of homes through Zillow Offers and Zillow Closing Services; (ii) the Internet, Media, and Technology division's providing advertising services and marketing and technology products and services to real estate agents and brokers through the Company's Premier Agent services; and (iii) the Mortgage division's providing mortgage-origination services through Zillow Home Loans.

62.    In its beginning, Zillow provided an innovative platform where sellers could list their properties and buyers could search for properties.  The Company generated revenue from advertisements and referral fees by connecting prospective buyers and sellers with real estate agents. However, Zillow's business model quickly became obsolete, and its reach to consumers slowed down, causing the Company's stock price to decline.

63.    In April 2018, Zillow announced that it was changing its business model to enter the Instant Buyer ("iBuyer") market and launched a new service called Zillow Offers.  This new business model would ultimately be dubbed Zillow 2.0.

64.    The key to the success of the iBuyer business model is to have a quick turnaround from buying the home, making certain repairs to it, and listing the property on the market, while at the same time cutting the cost of transactions.

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514



65.    The success of the Company's new business model depended entirely on its ability to accurately predict home values to make attractive offers for sellers while having profitable margins when reselling the property.  Throughout the Relevant Period, the Company knew that to ensure a good business model, Zillow had to (i) guarantee that its proprietary computer algorithms could accurately predict the values of homes; (ii) drive down its cost structure so that renovations could be done fast and at low costs; and (iii) quickly scale its Zillow Offers business by rapidly increasing the number of homes the Company was purchasing each quarter, thereby improving the Company's cost structure.

66.    Since the launching of the new business model and throughout the Relevant Period, Zillow continuously touted the ability of its algorithms to estimate home values accurately.  Its publicly available Zestimate's artificial intelligence results from around 15 years of real estate market data tailored to micro and macro markets data.  According to the Company, its algorithms can predict accurate home processes and price drops and was "all around better at everything required to complete real estate transactions."  Zillow algorithms drove the Company to determine

VERIFIED STOCKHOLDER
DERIVATIVE COMPLAINT

Page 18

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

1    what properties to buy, where to buy, how to repair, appraise, price for resale, and estimate the time
2    of the properties' turnaround.

3        67.    Zillow Offers would provide sellers with an initial offer that, once accepted, would
4    be adjusted, if necessary, by a pricing expert.  If the seller agreed to this second offer, the process
5    would continue until the Company made a final offer.  Along the way, Zillow would send its
6    renovations team to perform an inspection and identify repairs needed to get the house back on the
7    market.  The final offer resulted from the adjusted offer minus costs to make certain repairs on the
8    property.  The time to complete the transaction would range between seven and 90 days.

9        68.    Zillow was aware that the Company had begun the iBuyer business model late in the
10   game.  The Company's primary competitor, Opendoor, launched in 2014.  Another competitor,
11   Offerpad, entered the race in 2017.

12       69.    The Company's transition from essentially a media company to a new business model
13   based on providing customers with a seamless home transaction started in the Las Vegas and Phoenix
14   markets.  By the end of 2018, Zillow Offers expanded into the Atlanta, Denver, and Charlotte
15   markets.  For the year ending in 2018, the total income of Zillow was $1.3 billion.  By the end of
16   2019, the Company had expanded Zillow Offers to 22 markets and its revenue accounted for around
17   1.4 billion of Zillow's revenue for that year.  The Company staked its success on Zillow Offers and
18   projected that it would ultimately generate annual revenue of $20 billion by purchasing 5,000 homes
19   per month.

20       70.    In February 2019, the Company announced that Defendant Barton would return as
21   CEO.  Zillow also reported that Zillow Offers would further drive the Company's growth by
22   attaching ancillary services such as title insurance, closing services, and mortgages and referring
23   sellers to its Premier Agents.  Zillow Offers generated most of the Company's revenue in 2019,
24   operating in 22 markets across the country.

25       71.    After the COVID-19 pandemic began in 2020, the Company paused its Zillow Offers
26   home purchases, which slowed its growth trajectory for 2020.  In May 2020, the Company

27

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

1    announced that it would resume purchasing homes.  By the end of 2020, Zillow was purchasing

2    homes in 24 markets and controlling approximately 25% of the iBuyer market.  With this run, the

3    Company set itself to thrive.  The Company continued to stand behind its ambitious projections for

4    Zillow Offers while assuring its stockholders that management would not take unwarranted risks.

5        72.    In the years leading up to the Relevant Period, the Company continuously touted its

6    competitive position in the real estate market and its machine learning algorithm.

7        73.    The 2020 Form 10-K also alluded to Zillow Offers' competitive advantages due to

8    its years of data recollection and superior technology:

9        ***Inimitable living database of homes and superior data science and technology
     advantages***.  Our living database of more than 135 million U.S. homes is the result
10       of more than 15 years of substantial investment, sophisticated economic and
     statistical analysis and complex data aggregation of multiple sources of property,
11       transaction and listing data, including user updates to more than 34 million property
     records.  This data is the foundation of our proprietary Zestimate, Rent Zestimate,
12       Zestimate Forecast and Zillow Home Value Index. In 2019, we released a new, more
     accurate Zestimate, incorporating key learnings from the two-year, global Zillow
13       Prize competition.  ***The improved Zestimate currently has a median absolute
     percent error of 1.8% for homes listed for sale and 7.4% for off-market homes***.
14       ***These data and models also provide the foundation for our pricing algorithms for
     Zillow Offers***, although substantially more home-specific information is incorporated
15       to further refine the valuation for this application.

16   (Emphasis added.)

17
18       74.    On February 25, 2021, in a press release, Zillow announced that it had begun using

19   Zestimate, Zillow's home valuation model, to make initial offers to homeowners.  The press release

20   stated that the Company's new model would provide sellers with a seamless transaction process for

21   the sale of their homes and touted the technology and artificial intelligence advancements that

22   purportedly gave the Company a competitive advantage.  In relevant part, the press release stated as

23   follows:

24       ***Today's announcement highlights the growth in the reliability of the Zestimate***
     with Zillow standing behind its valuations to provide an initial cash offer on
25       qualifying homes through its Zillow Offers service.

26       Pairing the Zestimate with Zillow Offers is the latest way the company is using
     technology to simplify and streamline real estate transactions from beginning to end.

27

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

Zillow Offers customers can already use Zillow-affiliated mortgage, title and escrow services through Zillow Home Loans and Zillow Closing Services.

"For 15 years, homeowners and home shoppers have come to rely on the Zestimate as an essential first step.  This exciting advancement demonstrates the confidence we have in the Zestimate and the lengths we are willing to go to make selling your home truly seamless and easy," said Zillow Chief Operating Officer Jeremy Wacksman.  "This is a proud moment for Zillow's tech team and speaks to the advancements they've made in machine learning and AI technology.  Zillow is transforming the way people sell and buy homes.  Presenting the Zestimate as a cash offer to qualifying homes up front will save time, reduce friction and provide greater transparency— getting us closer to our vision of helping customers transact with the click of a button."

Zillow Offers is the company's home-buying service through which customers can sell their home directly to Zillow.  Choosing Zillow Offers gives customers a more hassle-free experience by eliminating the time and resources required to prepare and list a home, including open houses and showings.  Selling to Zillow Offers also minimizes in-person interaction.  The service aims to provide certainty about price and the convenience of selecting a closing date.

Today, the Zestimate is published for nearly 100 million homes **with a nationwide median error rate for on-market homes of 1.9%.**  To determine the Zestimate, Zillow uses data from public records, feeds from multiple listing services and brokerages as well as artificial intelligence, including advanced technologies such as computer vision and a deep-learning neural network to incorporate data from photographs.

Over the last decade and a half, Zillow has released more than half a dozen updates to the Zestimate to improve its accuracy, speed, transparency and availability.  The most recent version of the Zestimate was released in mid-2019, and incorporated winning ideas developed out of a two-year, $1 million data science competition that included more than 3,800 teams from 91 countries.

The initial offer equal to the Zestimate valuation is currently available on a limited subset of homes in markets where Zillow Offers operates.  Homeowners with qualifying homes will see the initial cash offer prominently displayed at the top of their property information on Zillow.  The company will continue expanding the number of eligible homes as Zillow Offers grows.  This initial offer is before taxes and fees are factored in and is also subject to eligibility and accuracy of property information.

(Emphasis added.)

75.    During an interview on *Bloomberg* television, also on February 25, 2021, Stan Humphries ("Humphries"), Zillow's Chief Analytics Officer, stated that the Company's algorithm

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT
Page 21
SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

was accurately pricing the homes and that the difference in pricing between sellers who opted to sell their home traditionally and those who used Zillow Offers was negligible.  Specifically, Humphries stated as follows:

> [F]or homes where we've made an offer for Zillow Offers but sellers have decided to sell their homes traditionally, so not sell to us …, those homes are selling for less than 1% difference than our offers we made to those consumers.  So we're very accurate on the homes that we're making Zillow Offers on right now."

76.     On May 4, 2021, the Company announced its financial results for first quarter 2021.  Those results showed that Zillow's revenue had declined to $701.0 million compared to the same quarter in 2020 and that Zillow had only sold 1,965 homes at an average price of $356.7 thousand per home.  Notwithstanding these negative disclosures, the Company touted that it continued to rebuild its home inventory and would increase its home buying and selling activities.

77.     On May 5, 2021, the Company filed its financial results on Form 10-Q with the SEC for its first quarter 2021.  ("Q1 2021 Form 10-Q").  The Q1 2021 Form 10-Q attributed any slow-down in the growth of Zillow Offers to the pandemic and represented that Zillow Offers business would increase its revenue in the following quarters:

> Homes segment revenue decreased 9% to $704.2 million, primarily due to a decrease of $68.1 million, or 9%, in Zillow Offers revenue.  Zillow Offers revenue declined to $701.0 million due to the sale of 1,965 homes at an average selling price of $356.7 thousand per home, as compared to the sale of 2,394 homes at an average selling price of $321.3 thousand per home in the comparable prior year period.  While we have resumed home buying in all Zillow Offers markets following our temporary pause in the first half of 2020, we are continuing to rebuild our inventory available for resale.  We expect Zillow Offers revenue to increase in future periods as we expect to continue to increase our home buying and home selling activities across all markets.

78.     The Q1 2021 Form 10-Q also stated that there were no material changes in risk factors:

> There have not been any material changes to the risk factors affecting our business, financial condition or future results from those set forth in Part I, Item 1A (Risk Factors) in our Annual Report on Form 10-K for the fiscal year ended December 31, 2020.  However, you should carefully consider the factors discussed in our Annual

Report on Form 10-K, which could materially affect our business, financial condition or future results. Additional risks and uncertainties not currently known to us or that we currently deem to be immaterial also may materially adversely affect our business, financial condition and/or operating results.

79.    Also on May 4, 2021, the Company held its first quarter 2021 earnings call. During the related earnings call, Defendant Barton stated the following:

Our top-of-funnel engagement with our customers translated into excellent results across Zillow suite of products and services. Our flagship buy side business, Zillow Premier Agent, once again generated the strongest results we've ever seen, reporting 38% revenue growth year-over-year in Q1. Our nascent sell-side business, Zillow Offers, continued to accelerate out of the pause we instituted in the pandemic, generating over $700 million in revenue and surpassing our internal expectations on revenue, EBITDA and unit level economics. . . .

80.    During the call, Defendant Barton claimed that "Zillow 2.0" was being well received by customers:

Pursuit of these growth opportunities deserves continued appropriate reinvestment of profits. As part of that journey, we recently launched a new advertising campaign with the tagline "To Move is to Grow". We think it wonderfully captures the essence of why moving is both exciting and daunting, and how we at Zillow are increasingly able to help our customers navigate this crossing.

The campaign supports the expedition we are on as a company as well. Just as we've been reorienting our employees and mission around transactions, we have the exciting task of reeducating our customers on who the new Zillow is and what we can do for them. *Every signal we see based on data and customer feedback is that customers expect and demand a more seamless experience. This is Zillow 2.0.*

*A great example of our customers' enthusiasm for ease is the reaction to our recent announcement that many homeowners in Zillow Offers markets now can see that their Zestimate is a live initial offer from Zillow. The announcement press alone drove record-breaking interest in the service with requests coming in at levels we've never seen before.*

(Emphasis added.)

81.    During the earnings call, Zillow again acknowledged that a large portion of Zillow Offer's success during the quarter was due to the ongoing strong housing market but represented

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

that a large portion of the improvements came from durable operational cost improvements that Zillow had implemented.  Specifically, Defendant Parker stated as follows:

> Growth in Zillow Offers continued to reaccelerate in Q1.  We reported [H]ome segment revenue of $704 million, which exceeded the high end of our outlook with 1,965 home sales.  Resale velocity was above our expectations.  In Q1, we sold 128% of the beginning inventory of 1,531 homes, which contributed to inventory declining at the end of Q1 to 1,422 homes.  Purchases increased to 1,856 homes in the quarter from 1,789 homes purchased in Q4, but not quite at the pace we planned as we continue to work on refining our models *to catch up* with the rapid acceleration in home price appreciation.
>
> During Q1, we continued to focus on unit costs, automation, adding capacity and sharpening pricing models to improve offer strength as we continue to scale.  Our Q1 Zillow Offers unit economics of 549 basis points return before interest expense was above the plus or minus 200 basis point guardrails we've set for ourselves while working to scale the business.  The outsized unit economic results were impacted by the ongoing strong housing market, which is temporal in nature.  ***We made progress during the quarter on improving offer strength and sharpened pricing that tightened our unit economics by approximately 120 basis points from that of Q4. The durable operational improvements in overall cost per home contributed 280 basis points improvement from Q1 2020.***

(Emphasis added)

82.    In touting the Company's commitment and confidence in Zillow Offers, Barton further expressed during the call:

> But on [Zillow Offers], in particular, […] we're leaning in, like -- we're leaning in. We're expanding in the 25 markets.  We're heavily staffing, as I think we made an announcement, maybe Allen just talked about it, too.  We are planning as a company. I'm hiring a net 2,000 people in 2021, and a lot of that will be for Zillow Offers.  And we're making other investments in [Zillow Offers] as well.  ***So we are comfortable with that increased investment because of what we're seeing top of funnel*** because what we know about the consumer value proposition.  And also, we're leaning in because most consumers don't even know what Zillow Offers is yet.  They don't even know—we've got to take Zillow 2.0 out of the kind of quarterly conference call realm and into the consumer awareness realm.  And so we've got a lot of work to do there, and we're basis points penetrated in the business overall.  So long answer, but we're feeling—***we're leaning in and feeling good***.

(Emphasis added.)

VERIFIED STOCKHOLDER
DERIVATIVE COMPLAINT
Page 24
SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

83.    During the related earnings call on the same day, Zillow informed that Zillow Offers home purchasing volume was not where the Company predicted it should be but that the Company continued to improve its models to catch up with home pricing appreciation. Later, in June 2021, Zillow announced that it had improved its pricing model to better react to market trends and refined its home value estimates.

84.    Also on May 5, 2021, the Company published a letter to its stockholders. In pertinent part, the letter stated the following:

> We continued to re-accelerate our Homes segment activity in Q1, purchasing 1,856 homes and selling 1,965 homes in Zillow Offers. The number of homes purchased grew sequentially from Q4 2020 as we continued to innovate the customer experience and offerings. Most prominently, we launched Zestimate as an initial offer, which is beginning to improve automation of our offers, and we made additional operational improvements across customer experiences that we believe will put us in a strong position to scale the business in periods ahead. The Q1 resale velocity, in which 128% of beginning inventory was sold during the quarter, was ahead of plan. This resulted in Homes segment revenue ahead of our outlook as a portion of sales were pulled into Q1 that we would have otherwise expected to be in Q2. As a result, we ended the quarter with 1,422 homes in inventory, down from Q4.

> Zillow Offers gross profit was $64 million in Q1, and average Zillow Offers gross profit per home sold was $32,644. Homes segment loss before income taxes was $58 million in Q1. Homes segment Adjusted EBITDA was a loss of $34 million, exceeding the high end of our outlook range. The Adjusted EBITDA outperformance was primarily due to stronger-than-expected home price appreciation in our Zillow Offers markets. Operating costs per home were up slightly compared to Q4. Average return on homes sold before interest expense was a gain of $19,590 per home, or 549 basis points as a percentage of revenue.

85.    On June 15, 2021, Zillow issued a press release announcing that it had improved Zestimate, its pricing model, so that it would react quicker to market trends and thereby could more accurately predict the values of homes. In relevant part, the press release stated as follows:

> Zillow today launches significant upgrades to its Zestimate® home valuation model. ***The changes allow the algorithm to react more quickly to current market trends*** …. The new Zestimate algorithm leverages neural networks, the latest machine learning approach, and incorporates deeper history of property data such as sales transactions, tax assessments and public records, in addition to home details such as square footage and location.

VERIFIED STOCKHOLDER
DERIVATIVE COMPLAINT

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

Neural networks are artificial intelligence systems that imitate how the human brain works.  They are able to map hundreds of millions of data points efficiently, drawing connections among inputs and using the relationships formed to produce or predict an output.  In the case of the Zestimate algorithm, the neural network model correlates home facts, location, housing market trends and home values.

As a result of this update, the **Zestimate can now react more quickly to dynamic market conditions, providing homeowners with a more accurate estimate [prediction] of a home's current value.**  In addition, transition to a neural network-based model will reduce Zestimate processing time.

'Since we introduced the Zestimate in 2006, we have never stopped innovating in order to provide consumers with the most accurate home valuations,' said Dr. Stan Humphries, Zillow chief analytics officer and creator of the Zestimate.  'The new architecture we're debuting today represents another significant step forward in our efforts to **harness big data to create more certainty for consumers, which leads to better decisions.'** . . .

As a result of the company's increasing confidence in Zestimate accuracy, in February Zillow began using the Zestimate as a live, initial cash offer through its home buying program, Zillow Offers.  The Zestimate is an initial cash offer on about 900,000 eligible homes across 23 markets.  With this latest update and increased Zestimate accuracy, the number of homes eligible for a cash offer will likely increase by 30%.

(Emphasis added.)

## DEFENDANTS BREACH THEIR DUTIES
## TO THE COMPANY AND ITS STOCKHOLDERS

86.    During the Relevant Period, the Company failed to inform its stockholders that it was not relying on its algorithm to make offers on the homes it purchased.  Rather, the Company retooled the system to raise price estimates and had purchased properties at up to a 7% markup from what its algorithm estimated.  Zillow had implemented a plan to accelerate the pace and volume of home purchases by offering prices well above the market values estimated by its algorithm.  The Company also had decreased the scope of renovations and reduced the scope of upgrades while attempting to squeeze its regular contractors on price.  Reluctance of contractors to perform work under the new arrangements caused the Company to own properties for extended periods of time, thereby accruing significant carrying costs.

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

87.     Rather than admit these facts, Defendants repeatedly made materially false and misleading statements and failed to disclose these and other material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants failed to disclose that (i) between the first and second quarter of 2021, the Company initiated its so-called "Project Ketchup" in order to accelerate the purchase of homes so that Zillow could achieve its 3-to-5-year volume goals of purchasing monthly 5,000 homes and achieving $20 billion in annual revenue; (ii) in an attempt to attain volume goals the Company was overriding the offer prices generated by its algorithm and analysts pricing value models, thereby overpaying for homes in order to entice homeowners to sell to the Company; (iii) Zillow was also reducing the scope of renovations and budget to pay for such renovations and contractors; (iv) as a result of the over-priced home purchases and renovation cost-cutting and the contractor shortages, the Company had a backlog in inventory causing the houses to sit in inventory longer and increasing carrier costs; and (vi) consequently, the Company had to wind down its inventory and sell the properties at well-below purchase price.  The Individual Defendants failed to disclose that Zillow created a false and misleading impression that the growth of and demand for Zillow Offers was organic and based upon Zillow's frequently discussed and highlighted algorithm and pricing models.  They also created the false and misleading impression that Zillow Offers' favorable margins were the result of durable and sustainable operational and cost improvements.

### August 5, 2021:  Form 10Q for the Second Quarter of 2021

88.     The Relevant Period begins on August 5, 2021, when the Company filed its financial results for its second quarter 2021 on Form 10-Q ("Q2 2021 Form 10-Q") with the SEC.  The Q2 2021 Form 10-Q stated that the Company had generated a total revenue of $1.3 billion compared to the $0.8 billion generated for the same period of the year 2020, which represented a 70% year-over-year growth.

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

89.    In the Q2 2021 Form 10-Q, the Company attributed to Zillow Offers an increase in revenue by $318.2 million to $772.0 million as a result of the sale of 2,086 homes at an average selling price of $370,100.

90.    The Q2 2021 Form 10-Q also stated that the Company's gross profit increased by $257.5 million, or 92%, due to rises in gross profit of, among other, $50.3 million in the Company's Homes segment, resulting in a total gross margin improvement of 4%.

91.    Per the Q2 2021 Form 10-Q, the Company's Homes segment gross profit was driven by an improvement of 5% in gross margin, primarily due to growth in revenue outpacing growth in cost of revenue because of home price appreciation in Zillow Offers markets and cost management driven by operational improvements.

92.    The Q2 2021 Form 10-Q also stated that there were no material changes in risk factors:

> There have not been any material changes to the risk factors affecting our business, financial condition or future results from those set forth in Part I, Item 1A (Risk Factors) in our Annual Report on Form 10-K for the fiscal year ended December 31, 2020. However, you should carefully consider the factors discussed in our Annual Report on Form 10-K, which could materially affect our business, financial condition or future results. Additional risks and uncertainties not currently known to us or that we currently deem to be immaterial also may materially adversely affect our business, financial condition and/or operating results.

### August 5, 2021:  Press Release

93.    On the same day, Zillow also issued a press release in which Defendant Barton was quoted as stating "Zillow is making rapid and significant progress toward building a seamless, integrated real estate experience for our customers and partners." He continued by stating that "[o]ur strong second-quarter results show how well we're executing on the three- to five-year growth objectives we announced in 2019."

94.    The press release continued quoting Barton touting the success of the Zillow Offers and that it relied in its target sector, millennials, to drive its success:

**VERIFIED STOCKHOLDER
DERIVATIVE COMPLAINT**

Page 28

[P]articular note, our iBuying business, Zillow Offers, continues to accelerate as we offer more customers a fast, fair, flexible, and convenient way to move. Zillow Offers is proving attractive to sellers even in this sizzling-hot seller's market. Finally, we expect millennial-buyers, low interest rates, and the increasing adoption of location-flexible work policies, to fuel interest in moving for many years to come. And these movers will increasingly demand e-commerce-like solutions where Zillow excels.

95.    The press release also stated that the Company's unit economics for the second quarter 2021 was 576 basis points. In relevant part, the press release stated as follows:

The Adjusted EBITDA outperformance was primarily due to higher volume and operational improvements, as well as stronger than expected home price appreciation in our Zillow Offers markets. Average return on homes sold before interest expense was a gain of $21,335 per home, or 576 basis points as a percentage of revenue.

**August 5, 2024:  Stockholder Letter**

96.    On the same day, the Company published a letter to its stockholders stating the following:

Despite some monumental curveballs like a global pandemic, we are on track with each of the three-to five-year growth objectives we set for ourselves in early 2019. We are in a strong position and executing with operational rigor as we innovate and integrate our product offerings to deliver a seamless home transaction experience. As we evolve on our journey, we are also evolving how we measure success. This quarter, we are introducing gross profit as a GAAP financial measure that better demonstrates the growth of the Zillow ecosystem.

97.    The stockholder letter included a Homes segment, which touted that the Company had a strong customer demand for Zillow Offers. In pertinent part, the stockholder letter indicated as follows:

As we previously discussed, the strong customer demand for Zillow Offers at the start of the quarter continued to accelerate in Q2, resulting in the purchase of 3,805 homes and sale of 2,086 homes. The record number of homes purchased was more than double that of Q1 2021 and is a direct reflection of the customer value proposition, the progress we have made in strengthening our pricing models and automation when providing offers to customers. These drivers resulted in rapid gains in our customer conversion rate from requested offers to signed agreements, which drove inventory to more than double from the end of Q1, with 3,142 homes in inventory at the end of Q2.

*        *        *

VERIFIED STOCKHOLDER
DERIVATIVE COMPLAINT

Page 29

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

1  We expect homes that we purchase to have tighter pricing assumptions closer to our
2  self-imposed guardrails of +/1 200 basis points before interest expense over the
   course of the second half of the year.

3     98.    Moreover, the Company's stockholder letter gave an outlook for third quarter 2021

4  of a total revenue between $1.9 and $2.0 billion, attributing between $1.4 and $1.5 billion to its

5  Homes segment.

6                      **August 5, 2024:  Earnings Call**

7     99.    During the related earnings call, also on August 5, 2021, Defendant Barton stated as

8  follows:

9         On the sell side, Zillow Offers continued to accelerate in Q2 with a record 3,805
10        homes purchased.  We sold 2,086 homes, generating a record $777 million in
          revenue in our Home segment, surpassing our internal expectations for both
11        revenue and EBITDA.  Importantly, the Zillow Offers value proposition of a
          fast, fair, flexible and convenient close has proved more than durable even in
12        the sizzling hot sellers' market.  It's a nod to just have a dreadful and dreaded
          prospect of selling, buying and moving its people.  Likely this is not a surprise
13        to any of you. In our surveys of homeowners who want and need to move, when
          we present the Zillow Offers concept, the largest objection is there must be a
14        catch. I'm pretty happy to market to that objection.

15        As we discussed on our last call, we entered Q2 with strong customer interest
          in ZO, which accelerated throughout the quarter and into Q3.  Allen will get
16        into more details.  But as we said on our Q1 call, we saw significant customer
          demand at the beginning of Q2 that we expected would drive revenue growth
17        on a lagged basis in Q3, which is now leading to our strong Q3 outlook.  And
          we continued to see strong growth in customer demand as we entered Q3 that
18        we expect will favorably impact revenue in future quarters.

19        With that in mind, we are focused on making progress automating key
          workflows in support of building a large-scale operation.  Also as we discussed
20        last quarter, we recognized that our Zillow Offers unit economics are above our
          plus or minus 200 basis point guardrails as we build and scale the business, a
21        trend that continued in Q2 despite our efforts.  We expect these unit economic
          trends to normalize over time as we iterate, continue to learn and as home price
22        appreciation inevitably slows.  We've been testing pricing elasticity in this hot
          housing market and we saw rapid conversion game throughout the quarter as
23        we improved our offer strength.  We believe these tests will serve as well across
          future market conditions.  As we strive to be a market maker across housing
24        cycles.  We expect to the homes we are scheduled to purchase will trend towards
          our plus or minus 200 basis points target over the course of the second half of
25        the year.

26

27
   **VERIFIED STOCKHOLDER**              Page 30
   **DERIVATIVE COMPLAINT**

100.    Defendant Barton then touted that the Company believed there "is strong durable support for the housing market" and further hyped the Company's algorithm.  Particularly, Barton stated as follows:

> [D]ream started with both the Zestimate, our killer algorithm that put a price on every rooftop in America and zillow.com one marketplace where everyone could search and find homes with data easily at their fingertips, something not possible prior to Zillow.  This transparency and convenience became the accelerant for establishing Zillow's brand in real estate and making it the most popular place to dreamland shop with an average of 229 million monthly unique users coming to our mobile apps and websites in Q2, including our great adopted sister brands, Trulia and StreetEasy.

101.    Barton continued advertising the strong Zillow Offers' pricing models and informed that Zillow was back on schedule to achieve its overly ambitious 2019 objectives regarding the purchase of homes and revenue goals:

> As I said above, we are now back on track with our original objective to purchase 5,000 homes per month and to generate annualized revenue of $20 billion within the original 3- to 5-year timeline.  For Zillow Home loans, we are also on course to achieve our stated goal of 3,000 mortgages originated per month within the original time frame we set.
>
> Today, we are seeing more and more signals from our customers that validate our integration thesis and growth strategy. …

102.    Barton further proclaimed his excitement for Zillow Offers, "I confess to being quite excited by how well Zillow Offers is doing in such a hot sellers' market…"

103.    During the same call, Defendant Parker touted the Company's purported strength and continued improvement of Zillow Offers' pricing models:

> ***Growth in Zillow Offers continued to accelerate in Q2 and exceeded our expectations,*** with 2,086 homes sold, driving $777 million in Home segment revenue. ***We made progress this quarter in improving our pricing models, including launching the neural Zestimate, which sharpened our offer strength. The neural Zestimate puts more weight on attributes of homes and allows more granularity at the asset level, placing less emphasis on repeat home sales price comparisons.***  In addition, we continue to make progress building automation at the top of the funnel when providing offers to customers.  ***These improvements drove rapid gains in conversion rates in Q2 when compared to Q1, resulting in record purchases,*** more than catching up to our pre-pandemic pace.

VERIFIED STOCKHOLDER
DERIVATIVE COMPLAINT

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

1  (Emphasis added.)

2      104.    With respect to the third quarter Homes segment revenue, Defendant Parker stated,

3  in relevant part, the following:

4      In Q3, we expect our Homes segment revenue to increase sequentially from Q2 to
       $1.45 billion at the midpoint of our outlook range.  This step-up in pace demonstrates
5      our confidence in our ability to scale, resulting from the progress we have made in
       strengthening our pricing models and automating the top of the funnel.
6
       Evidence of our accelerated pace can be seen in our homes under contract, which
7      was $1.2 billion at the end of Q2, up 126% from $511 million at the end of Q1.  I will
       reiterate that our goal here is to become a true market maker.  As we think about unit
8      economics on a go-forward basis, we would expect to see a unit economics trend
       towards our stated goal of plus or minus 200 basis points before interest expense over
9      the course of the second half of the year.

10     105.    During  the  same  earnings  conference  call,  Defendant  Parker  also  touted

11  improvements in Zillow's pricing models:

12     We made progress this quarter in improving our pricing models, including launching
       the Neural Zestimate, which sharpened our Offers strength.  The Neural Zestimate
13     puts more weight on attributes of Homes and allows more granularity at the asset
       level placing less emphasis on repeat home sales price comparisons.
14
15     In addition, we continue to make progress building automation at the top of the funnel
       when providing offers to customers.  These improvements drove rapid gains in
16     conversion rates in Q2 when compared to Q1, resulted in record purchases, more than
       catching up to our pre-pandemic pace.  We purchased 3,805 homes during the second
17     quarter, more than double what we purchased in Q1.  Our Q2 Zillow Offers unit
       economics of 576 basis points before interest expense was above the plus or minus
18     200 basis point guardrails we set for ourselves while working to scale the business.
       The outsized unit economic results of 665 basis points higher than Q2 2020 did
19     benefit from the ongoing strong housing market, which we fully recognize is temporal
       in nature, and largely contributed to the 312 basis points, lower home acquisition
20     costs of 87.1% in Q2.
21
       We also note that the 353-basis point improvement from a year ago in renovation,
22     holding and selling costs were largely durable operational improvements, clearly
       some portion of the holding costs and a smaller portion of the renovation costs likely
23     benefited from the strong housing market.  But we also see opportunities for
       continued operational improvements over time.
24
25     106.    With respect to the third quarter Homes segment revenue, Parker stated, in relevant

26  part, the following:

27

In Q3, we expect our Homes segment revenue to increase sequentially from Q2 to $1.45 billion at the midpoint of our outlook range. This step-up in pace demonstrates our confidence in our ability to scale, resulting from the progress we have made in strengthening our pricing models and automating the top of the funnel.

107.    The statements identified in ¶¶ 88-106 were materially false and misleading and failed to disclose material adverse facts about Zillow's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors that (i) between the first and second quarter of 2021, the Company initiated Project Ketchup in order to accelerate the purchase of homes so that Zillow could achieve its 3-to-5-year volume goals of purchasing monthly 5,000 homes and achieving $20 billion in revenue, (ii) in an attempt to attain volume goals the Company was overriding the offer prices generated by its algorithm and analysts pricing value models, thereby Zillow was overpaying for homes in order to entice sellers to sell their homes to the Company, (iii) Zillow was reducing the scope of renovations and budget to pay for such renovations and contractors, (iv) as a result of the Company's overpaying for homes and its renovation cost-cutting and the contractor shortages, the Company had a backlog in inventory causing the houses to sit in inventory longer and increasing carrier costs, and (v) consequently, as a result of the foregoing, the Company had to wind-down its inventory and sell the properties at well below purchase price. The Individual Defendants failed to disclose that Zillow created a false and misleading impression that the growth of and demand for Zillow Offers was organic and based upon Zillow's frequently discussed highlighted algorithm and pricing models and that Zillow Offers' favorable margins were the result of durable and sustainable operational and cost improvements

108.    The Company made materially false and misleading statements to investors about its operations. Zillow publicly claimed that its increased business volume and higher conversion rates were the result of sophisticated improvements to its pricing algorithms, suggesting they had enhanced their "neural network" model to better predict and respond to market trends. However, this was deceptive - rather than actually improving their underlying algorithmic model, Zillow was

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

1  simply applying manual adjustments ("overlays") on top of the model's output figures to drive

2  higher volumes.

3      109.    During the second quarter 2021 earnings conference call, Zillow's executives

4  compounded this deception by repeatedly emphasizing that they were seeing robust and accelerating

5  customer demand for Zillow Offers throughout the quarter.  These statements painted a misleading

6  picture of organic market interest in their iBuying service.  The truth was far different - rather than

7  natural market demand, Zillow had artificially manufactured the appearance of strong demand by

8  offering excessive and financially unsustainable purchase prices to homeowners.  These inflated

9  offers were specifically designed to entice sellers and drive up Zillow's home purchase volumes, but

10  did not reflect genuine market dynamics or sustainable business practices.

11      **September 13, 2021:  Piper Sandler 2021 Virtual Global Technology Conference**

12      110.    On September 13, 2021, Defendant Wacksman represented Zillow during the Piper

13  Sandler 2021 Virtual Global Technology Conference.

14      111.    During the conference, when asked about the Company reacting better to the volatile

15  real estate pricing environment, Defendant Wacksman responded to the following:

16      **Analyst**: Let's switch gears and talk a little bit about the Zoffers [Zillow Offers]
17  business. And I think the company was able to really effectively rebuild inventory in
the second quarter. And this was more of a challenge in 1Q. Maybe you could talk a
18  little bit about what changed in the interim and how the company is getting better
able to react.

19      **Wacksman:** Yes. I mean you hit on it. Some of the inventory growth timing was just
20  based on the fastest home price appreciation we -- any of us had ever seen before and
much stronger than both our internal and other third-party forecast we're seeing at
21  the beginning of the year. So keeping up with rising home price appreciation, both on
our acquisition side and then finding that price in the markets we're in, that continue
22  to be a new and unique challenge coming out of pandemic. ***But I will say what we've***
23  ***learned is that this business, Zillow Offers, is a business that exists across all***
***housing market cycles, right? And that's been a question that we've touched on***
24  ***over the past few years. Is Zillow Offers more interesting in a hot or a cold or a***
***medium market? Zillow Offers is a really interesting opportunity for our customers***
25  ***in all markets.*** Now what customers may value continues to shift, right? In a super
hot market, it's not as hard to sell your house, yet we're still seeing record demand
26  for Zillow Offers and services like us. And why is that?

27

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

1

2

3

4

5

> It's because customers – those same customers are struggling to buy. And they need to fix and get the certainty of selling so they can both go -- go be a competitive buyer in a hot market, right? Now in a cooling market, maybe that's not as much their focus, but the certainty is. And then underlying all that is the convenience factor of you have to live in this asset while you try and sell it and move. So we were really encouraged to see while we saw these incredibly hot markets, ***the strength and the appeal for Zillow Offers just continues to grow, and we're even more confident now that this is going to be a service really in all-weather markets.***

6

(Emphasis added.)

7

8

112.     With respect to the Company's long-term financial targets and the steps taken to scale the business to its $20 billion annual revenue target, Defendant Wacksman said the following:

9

10

11

12

13

14

15

16

17

18

> Yes, it's a good question. And it's important to remember, as exciting as we get about Zillow Offers and I think a lot of our investors get about Zillow Offers, it's still incredibly early. I mean we are basis points of market share in the country right now. And so that portends two big challenges. One is customer awareness and demand challenge. The vast majority of people haven't heard about this. And that's going to take time. You discover things, you tell your friends about them, you come to trust them and you ideally trust them from brands you know and trust like Zillow. And then there's an operational challenge to that. So as we build to these new levels of scale, it requires even more technology, tools and automation to be able to deliver these services more quickly and more cheaply at scale which then reinforces the flywheel of stronger offers to more customers, more transactions, begets more customers; so both of those are challenges.
> I would say in the near term, for us, the operational challenge is more acute, ***just given we're seeing so much demand even with the low awareness and low trial of Zillow Offers and services like ours.*** But over time, to get to that scale and then ultimately get to the long-term margin profile we talked about, we see both of them as really exciting challenges to go tackle.

19

(Emphasis added.)

20

21

22

23

113.     When questioned with regards to "durable" unit level economics and the Company's ability to hit long term margins and profitably run the business, Defendant Wacksman answered the following:

24

25

26

27

> Yes. It's a good question. And we talk about wanting to run the business at a plus or minus 200 basis point guardrail on the unit level. And in Q2, we saw unit economics of nearly 600 basis points, I think 576 basis points. And so yes, a good chunk of that is home price appreciation, right, in the market. And you saw that in HPA itself, but also in kind of holding costs correlated with the velocity of sale. But some of those unit economic improvements are durable, right? The work we're doing on more

**VERIFIED STOCKHOLDER
DERIVATIVE COMPLAINT**

Page 35

dynamic renovations, the work we're doing on selling costs as our [H]omes brokerage improvements roll out more gradually, you're going to see us book those improvements as unit economic savings to the unit and be able to pass those back on to the customer and eventually to the bottom line. So, we feel great about the ability to get to scale.

114.    The statements identified in ¶¶ 111-13 were materially false and misleading and failed to disclose material adverse facts about Zillow's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors that (i) between the first and second quarter of 2021, the Company initiated Project Ketchup in order to accelerate the purchase of homes so that Zillow could achieve its 3-to-5-year volume goals of purchasing monthly 5,000 homes and achieving $20 billion in revenue, (ii) in an attempt to attain volume goals the Company was overriding the offer prices generated by its algorithm and analysts pricing value models, thereby Zillow was overpaying for homes in order to entice sellers to sell their homes to the Company, (iii) Zillow was reducing the scope of renovations and budget to pay for such renovations and contractors, (iv) as a result of the Company's overpaying for homes and its renovation cost-cutting and the contractor shortages, the Company had a backlog in inventory causing the houses to sit in inventory longer and increasing carrier costs, and (v) consequently, as a result of the foregoing, the Company had to wind-down its inventory and sell the properties at well below purchase price. The Individual Defendants failed to disclose that Zillow created a false and misleading impression that the growth of and demand for Zillow Offers was organic and based upon Zillow's frequently discussed highlighted algorithm and pricing models and that Zillow Offers' favorable margins were the result of durable and sustainable operational and cost improvements.

### October 18, 2021:  Press Release

115.    On October 18, 2021, Zillow issued a press release announcing that it had halted the signing of additional home purchase contracts throughout the rest of the year. The press release stated, in relevant part:

Due to a backlog in renovations and operational capacity constraints, Zillow announces its Zillow Offers business will not sign any new, additional contracts to buy homes through the end of the year. Pausing on new contracts will enable Zillow

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

Offers to focus operations on purchasing homes with already-signed contracts, but have yet to close, and reducing the renovation pipeline. Zillow will continue to market and sell homes through Zillow Offers during this period.

116. In the same press release, Defendant Wacksman was quoted as saying "we're operating within a labor- and supply-constrained economy inside a competitive real estate market, especially in the construction, renovation and closing spaces" and that Zillow had "not been exempt from these market and capacity issues." The Company also announced that it would connect prospective sellers with local Premier Agent partners.

117. On this news, Zillow's common stock (ZG) price fell $8.84 or 9.3%, to close on October 18, 2021, at $85.46. The Company's capital stock (Z) price fell $8.97 or 9.4% to also close on October 18, 2021, at $86.00 per share.

118. The statements identified in ¶¶ 115-116 were materially false and misleading and failed to disclose material adverse facts about Zillow's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors that (i) between the first and second quarter of 2021, the Company initiated Project Ketchup in order to accelerate the purchase of homes so that Zillow could achieve its 3-to-5-year volume goals of purchasing monthly 5,000 homes and achieving $20 billion in revenue, (ii) in an attempt to attain volume goals the Company was overriding the offer prices generated by its algorithm and analysts pricing value models, thereby Zillow was overpaying for homes in order to entice sellers to sell their homes to the Company, (iii) Zillow was reducing the scope of renovations and budget to pay for such renovations and contractors, (iv) as a result of the Company's overpaying for homes and renovation cost-cutting and the contractor shortages, the Company had a backlog in inventory causing the houses to sit in inventory longer and increasing carrier costs, and (v) consequently, as a result of the foregoing, the Company had to wind-down its inventory and sell the properties at well below purchase price. The Individual Defendants failed to disclose that Zillow created a false and misleading impression that the growth of and demand for Zillow Offers was organic and based upon Zillow's frequently discussed and

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

1    highlighted algorithm and pricing models and that Zillow Offers' favorable margins were the result

2    of durable and sustainable operational and cost improvements.

3    119. ████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████████

5    ██████████████████████████[2]

6    **INVESTORS LEARN THE TRUTH**

7    120. On November 1, 2021, *Bloomberg* published an article informing that Zillow was

8    seeking to sell 7,000 homes for $2.8 billion in an attempt to recover from a blunder in its high-tech

9    home-flipping.

10    121. The *Bloomberg* article also stated that the Company had purchased around 8,000

11    homes in its third quarter. The *Bloomberg* article indicated that out of an analysis of 650 homes

12    owned by Zillow, two thirds were priced below what the Company paid for them. The article

13    continued stating as follows:

14    > Zillow put a record number of homes on the market in September, listing properties
    > at the lowest markups since November 2018, according to research from YipitData.

15    > It also cut prices on nearly half of its U.S. listings in the third quarter, according to
    > Yipit, signaling that its inventory was commanding prices lower than expected.

16    122. On this news, the price of Zillow common stock (ZG) declined $20.24 per share over

17    two trading days, or more than 19%, from a close of $105.72 per share on October 29, 2021, to a

18    close of $85.48 per share on November 2, 2021. Similarly, the price of Zillow capital stock (Z)

19    declined $16.43 per share, or nearly 16%, from a close of $103.63 per share on October 29, 2021, to

20    a close of $87.20 per share on November 2, 2021.

21    123. On November 2, 2021, the Company issued a press release stating the financial results

22    for its third quarter 2021 and that it planned to wind down Zillow Offers. Therein, Defendant Barton

23    is quoted expressing the following:

24

25

26    [2] ████████████████████████████████████████████

27

VERIFIED STOCKHOLDER
DERIVATIVE COMPLAINT

Page 38

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

We've determined the unpredictability in forecasting home prices far exceeds what we anticipated and continuing to scale Zillow Offers would result in too much earnings and balance-sheet volatility," said Zillow Group co-founder and CEO Rich Barton. "While we built and learned a tremendous amount operating Zillow Offers, it served only a small portion of our customers. Our core business and brand are strong, and we remain committed to creating an integrated and digital real estate transaction that solves the pain points of buyers and sellers while serving a wider audience."

The wind-down is expected to take several quarters and will include a reduction of Zillow's workforce by approximately 25%. "The most difficult part of this decision is that it will impact many of our colleagues," Barton said. "This is not something we take lightly. We are grateful for their efforts, and we are committed to providing a smooth transition."

124.    In the press release, the Company announced that it had a consolidated financial revenue of $1.7 billion.

125.    Zillow's Homes segment revenue was $1.2 million, below the Company's third quarter 2021 outlook between 1.4 and 1.5 million. Zillow attributed not hitting its target to renovation and resale capacity constraints.

126.    The Company also reported a net loss of $328 million in the third quarter. As a result of the over price purchased homes, the Company's third-quarter financial results included a write-down in inventory of approximately $304 million within the Homes segment. The press release also stated that for its fourth quarter 2021, the Company expected an additional $240 million to $265 million in write downs.

127.    In fact, while the Company "leaned into offer strength to drive volume and try to find price," it understood that "1-3 months of acquisitions were priced above-market" and that it would suffer "significant losses with risk of unit profitability under the +/-2% range for homes priced in the Q2-Q3 timeframe, which [were] expected to sell largely in Q4."[3]

128.    Also on November 2, 2021, the Company released a letter to stockholders for the third quarter 2021. Therein, the Company reiterated that it was letting go of 25% of its workforce,

---

[3] *Id.*

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

and that it had "determined that further scaling up Zillow Offers is too risky, too volatile to our earnings and operations, provides too little opportunity for return on equity, and serves too narrow a portion of our customers."

129.     The letter to stockholders continued by stating as follows:

Because of this price forecasting volatility, we have had to reconsider what the business might look like at a larger size.  We have offered sellers a fair market price from the start of Zillow Offers, while also being clear that the business would only become consistently profitable at scale.  We have determined this large scale would require too much equity capital, create too much volatility in our earnings and balance sheet, and ultimately result in far lower return on equity than we imagined.

This home price forecasting volatility has also contributed to significant capacity and demand planning challenges, exacerbated by a difficult labor and supply chain environment, leading to our announcement two weeks ago to suspend signing new contracts through the end of this year.  We judge future significant volume volatility to be an impediment to ramp a scaled operation, and any interruptions in the supply chain like we've recently experienced could result in increased holding times, further increasing our exposure to volatility.

A final factor in the wind-down decision is that, to date, we have been able to convert only about 10% of the serious sellers who ask for a Zillow Offer, and have tended to disappoint the roughly 90% who didn't sell to us.

130.     With respect to the Company's Homes segment result, the letter to stockholders stated that the "higher-than-anticipated conversion rates during Q3 resulted in the purchase of 9,680 homes, further pressuring our renovation and resale capacity constraints.  This resulted in 3,032 homes sold in Q3, below our expectations."  The letter also stated that write down on inventory was a result of unintentionally purchasing homes at higher prices than "our current estimates of future selling prices."

131.     Per the letter, Zillow ended its third quarter with 9,790 homes in inventory and 8,172 homes under contract.  Zillow Offers "gross profit per home sold was a loss of $245 million in Q3 and [the] average Zillow Offers gross profit per home sold was a loss of $80,771, or nearly (2,100) basis points as a percentage of revenue."  The Company stated that before income taxes, the Homes

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

1  segment had a loss of $422 million in its third quarter.  Moreover, that the average return on homes

2  sold before interest was of $9,183 per home, or 237 basis points as a percentage of revenue.

3      132.    During the related earnings call, on the same day, Defendant Barton stated that the

4  Company was unable to "forecast the price of homes accurately three to six months into the future."

5  He continued stating that the Company was "unable to accurately forecast future home prices at

6  different times in both directions by much more than [Zillow had] modeled as possible, with Zillow

7  Offers unit economics on a quarterly basis swinging from plus 576 basis points in Q2 to ***an expected***

8  minus 500 to minus 700 basis points in Q4."

9      133.    Barton further addressed why the Company was unable to profitably scale:

> Because of the price forecasting volatility, we have also had to reconsider what the
> business would look like at a larger scale. We have offered sellers a fair market price
> from the start, but we've also been clear that the business only becomes consistently
> profitable at scale. With the price forecasting volatility we have observed and now
> must expect in the future, we have determined that the scale would require too much
> equity capital, create too much volatility in our earnings and balance sheet, and
> ultimately, result in a far lower return on equity than we imagined.

15      134.    Defendant Barton also blamed Zillow Offers' wind-down on labor issues and

16  renovations backlogs that were concealed during the Relevant Period:

> We have also experienced significant capacity and demand planning
> challenges, exacerbated by an admittedly difficult labor and supply chain
> environment.  The combination of these factors has caused a meaningful backup
> in our processing of homes in the Zillow pipeline, which we announced 2 weeks
> ago.

> We judged future significant volume volatility to be a tough impediment to
> ramp a scaled operation, and any interruptions in the supply chain like we
> recently experienced will result in increased holding times, further increasing
> our exposure to volatility and lowering our return on equity.

23      135.    Defendant Barton also admitted that "we have been ***able to serve only a limited***

24  ***number of customers.***  We've been able to convert only about 10% of the serious sellers who ask

25  for a Zillow Offer, ***and we have tended to disappoint the roughly 90% who didn't sell through us.***"

26  (Emphasis added.)

27

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

136.    During the earnings call Defendant Barton further admitted that "our price forecasting accuracy was far more volatile than we planned for and was further exacerbated by unpredictable black swan-type events" and that "that volatility contributed to operational volatility and cash flow and balance sheet volatility that is beyond the tolerance level that we are comfortable with moving forward."

137.    Indeed, as of August 31, Zillow Offers held a debt balance of $2.0B across its three credit facilities and inaugural securitization, backed by $2.5B of collateral, or 6,290 homes, and reflecting 81% average advance rate. The Company's debt capacity stood at $3.7 billion and Zillow's debt balance increased rapidly as a result of the above planned growth in Zillow Offers and underperformance in resale.[4] As a result, the capital team was unable to support inventory growth with new capital sources to build the Company's 3–5-year capital plan in the timeframe of six months.[5]

138.    On this news, both Zillow's common stock and capital stock plummeted on November 3, 2021. The price of Zillow common stock (ZG) dropped an additional $19.62 per share, or approximately 23%, to close at $65.86 per share, and the price of Zillow capital stock (Z) fell $21.73 per share, or approximately 25%, to close at $65.47 per share on the same day.

**THE INDIVIDUAL DEFENDANTS' KNOWLEDGE OF ZILLOW'S PRICING PROBLEMS, PROJECT KETCHUP, MANUAL PRICING OVERLAYS, AND THE GLUT OF OVERPRICED HOMES PURCHASED BY THE COMPANY**

139.    The    following    internal    documents, ███████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████

---

[4] *Id.* ZILLOW-00000372.

[5] *Id.*

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

**The December 2020 Board Memo**

140. 

141.

VERIFIED STOCKHOLDER
DERIVATIVE COMPLAINT

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

1

2

3    142.

4

5

6

7

8    **The June 2021 Board Memo**

9    143.

10

11

12

13

14

15

16

17

18

19

20

21

22

23    144.

24

25

26

27

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27



SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

1    145. ███████████████████████████████████
2    ████████████████████████████████████████
3    ████████████

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

10   ████████████████████

11   146. ██████████████████████████████
12   ████████████████████████████████████████
13   ████████████████████████████████████████
14   ████████████████████████████████████████
15   ████████████████████████████████████████
16   ████████████████████████████████████████
17   ███████████████████  █████████████████████
18   ████████████████████████████████████████
19   █████████

20   **The September 2021 Board Memo**

21   147. ██████████████████████████████
22   ████████████████████████████████████████
23   ████████████████████████████████████████
24   ████████████████████████████████████████
25   ████████████████████████████████████████
26   ██████████████

Schlemlein Fick & Franklin, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

1    148.   ███████████████████████████████

2    ████████████████████████████████████████

3    ████████████████████████████████████████

4    ████████████████████████████████████████

5    ████████████████████████████████████████

6    ████████████████████████████████████████

7    ████████████████████████████████████████

8    ██████████

9    149.   ███████████████████████████████

10   ██████████████

11   150.   ███████████████████████████████

12  ████████████████████████████████████████

13  ██████████████████████████████████

14  ███████████████████████████████████

15  ███████████████████████████████████

16  ███████████████████████████████████

17  ███████████████████████████████████

18  ██████████████████

19  ████████████████████████████████████████

20  ████████████████████████████████████████

21  ███

22  151.   ███████████████████████████████

23  ████████████████████████████████████████

24  ████████████████████████████████████████

25  ████████████████████████████████████████

26  ██████████████████████

27

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

1  152. 

2

3

4

5

6

7

8  153.

9

10

11

12

13  154.

14

15

16

17

18

19  155.

20

21

22

23

24  156.

25

26

27

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514



157.

158.

159.    On November 17, 2021, *The Wall Street Journal* published an article titled "What Went Wrong With Zillow? A Real-Estate Algorithm Derailed Its Big Bet." The article stated that the Company acknowledged it "was paying too much money for homes, and buying too many of them, just when price increases were starting to slow." The article revealed that Zillow's market capitalization which had "closed at a peak of $48.35 billion in February, is now around $16 billion."

160.    *The Wall Street Journal* further reported that the Company was aware it was falling behind since around its first quarter 2021:

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

In the spring, around the time that Zillow started worrying about the accuracy of its algorithm, company executives and managers came together for a tense meeting, according to a person who attended.

As first-quarter numbers trickled in, it became clear that even though it was making more money than anticipated, ***the company was on track to significantly miss its annual target for the number of homes it wanted to buy***. Worse, it was falling behind its top competitor, Opendoor.

"This is code red," Joshua Swift, senior vice president of Zillow Offers, said during the virtual meeting, according to the person who attended. Mr. Swift declined to comment through the company.

Zillow put together a plan to speed up the pace and volume of home purchases, dubbing it Project Ketchup—which employees took as a play on the team's mission to catch up to Opendoor. Zillow planned to buy more homes by spending more money, offering prices well above that its algorithm and analysts picked as market value, people familiar with the matter said.

161.    The article further confirmed that the Company was overruling its algorithm and analysts pricing models:

Staffers grew concerned Zillow was paying too much, people familiar with the matter said. Analysts whose job it was to confirm the prices of homes found that they were routinely overruled, because the Company had retooled the system to raise the analysts' suggested prices. Automatic price add-ons coded into the company system, including one called the "gross pricing overlay" that could add as much as 7% would boost offering prices to get more home sellers to say yes.

162.    *The Wall Street Journal* article indicated that the "median price Zillow was paying for homes in Phoenix—one of the biggest iBuyer markets—rose from $351,000 in May to $475,000 in September." Moreover, that two-thirds of the homes Zillow listed at prices lower than what the Company had paid for them at an average discount of 4.5%. By the fall, the Company was selling the homes at a 5%-7% loss profit, down from an average profit of almost 6% in the second quarter.

## PLAINTIFFS FILE SECURITIES CLASS ACTIONS

163.    On November 16, 2021, a purported purchaser of Company stock filed a securities class action complaint, captioned *Barua v. Zillow Group, Inc. et al.*, Case No. 2:21-cv-01551, in the United States District Court for the Western District of Washington against Zillow and defendants

VERIFIED STOCKHOLDER
DERIVATIVE COMPLAINT

Page 50

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

Barton, Parker, and Wacksman (the "*Barua* Complaint"). The *Barua* Complaint alleged that throughout the class period of February 10, 2021, to November 2, 2021, the Securities Class Action Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Securities Class Action Defendants failed to disclose to investors that (1) despite operational improvements, the Company experienced significant unpredictability in forecasting home prices for its Zillow Offers business; (2) such unpredictability, as well as labor and supply shortages, led to a backlog of inventory; (3) as a result of the foregoing, the Company was reasonably likely to wind-down its Zillow Offers business, which would have a material adverse impact on its financial results; and (4) as a result of the foregoing, the Securities Class Action Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

164. On November 19, 2021, a purported purchaser of Company stock filed a securities class action complaint, captioned *Silverberg v. Zillow Group, Inc. et al.*, Case No. 2:21-cv-01567, in United States District Court for the Western District of Washington against Zillow and defendants Barton, Parker, and Wacksman (the "*Silverberg* Complaint"). The Silverberg Complaint alleged that throughout the class period of February 10, 2021, to November 2, 2021, the Securities Class Action Defendants made materially false and/or misleading statements, failing to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the *Silverberg* Complaint alleges that the Securities Class Action Defendants failed to disclose to investors that (1) despite operational improvements, the Company experienced significant unpredictability in forecasting home prices for its Zillow Offers business; (2) such unpredictability, as well as labor and supply shortages, led to a backlog of inventory; (3) as a result of the foregoing, the Company was reasonably likely to wind-down its Zillow Offers business, which would have a material adverse impact on its financial results; and (4) as a result of the foregoing, the Securities Class Action

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

1    Defendants' positive statements about the Company's business, operations, and prospects were

2    materially misleading and/or lacked a reasonable basis.

3         165.    On January 6, 2022, a purported purchaser of Company stock filed a securities class

4    action complaint, captioned *Hillier v. Zillow Group, Inc. et al.*, Case No. 2:22-cv-00014, (the "*Hillier*

5    Complaint") in the United States District Court for the Western District of Washington against

6    Zillow and defendants Barton, Frink, Parker, and Wacksman.  The *Hillier* Complaint alleged that

7    throughout the class period of February 10, 2021, to November 2, 2021, the Securities Class Action

8    Defendants made materially false and/or misleading statements, as well as failed to disclose material

9    adverse facts about the Company's business, operations, and prospects.  Specifically, the *Hillier*

10   Complaint alleges that defendants failed to disclose to investors that (1) the Company knew that it

11   did not have the ability to properly price homes for its Zillow Offers business; (2) this inability, in

12   addition to labor and supply shortages, resulted in a backlog of inventory in the Zillow Offers

13   business; (3) as a result of the foregoing, the Company was reasonably likely to wind-down its Zillow

14   Offers business, which would have a material adverse impact of the Company's financial results;

15   and (4) as a result of the foregoing, Defendants positive Class Period statements about the

16   Company's business, operations, and prospects were materially misleading and/or lacked a

17   reasonable basis.

18        166.    On February 16, 2022, Judge Thomas S. Zilly of U.S.D.C. Seattle entered an order

19   consolidating the *Silverberg* and *Hillier* securities class actions with the *Barua* action and appointed

20   Jeremey Jaeger ("Jaeger") as Lead Plaintiff and his choice of counsel as Lead Counsel.  On May 5,

21   2022, Jaeger filed a Corrected Consolidated Class Action Complaint that shortened the alleged class

22   period to August 5, 2021, to November 2, 2021 and included the purported accounts of five former

23   Zillow employees to support its allegations.  Ultimately, the court recaptioned the case as *Jaeger v.*

24   *Zillow Group, Inc. et al.*, No. 2:21-cv-01551-TSZ (W.D. Wash.) (the "*Jaeger* Action").

25        167.    The gravity of the alleged misleading statements and their potential impact on the

26   Company has been underscored by recent developments in the *Jaeger* Action.  On December 7,

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

1   2022, the Court denied in large part the defendants' motion to dismiss the consolidated class action

2   complaint, finding that the plaintiffs had adequately alleged actionable misrepresentations or

3   omissions, scienter, and loss causation.  Order 7-22, *Jaeger* Action, Dec. 7, 2022, ECF No. 97.  This

4   ruling significantly strengthens the claims against Barton, Parker, and Wacksman and increases the

5   potential liability for the Company.

6       168.    Furthermore, on August 23, 2024, the Court granted the Lead Plaintiff's motion for

7   class certification, certifying a class of all persons who purchased Zillow stock between August 5,

8   2021, and November 2, 2021.  Order 18-19, *Jaeger* Action, Aug. 23, 2024, ECF No. 137.

9   Importantly, the Court rejected the defendants' attempts to rebut the fraud-on-the-market

10  presumption of reliance, finding that the defendants failed to show the alleged misrepresentations

11  and corrective disclosures had no impact on Zillow's stock price.  *Id.* at 14-18.

12      169.    These judicial developments substantially increase the likelihood of Company

13  liability in the *Jaeger* Action, potentially exposing Zillow to significant damages.  The certification

14  of the class, in particular, expands the scope of potential damages as it allows all purchasers of Zillow

15  stock during the relevant period to participate in any recovery.  This heightened legal risk, combined

16  with the serious nature of the officer and directors' alleged misconduct, underscores the urgent need

17  for the Board to take decisive action to protect the Company's interests and hold the responsible

18  parties accountable.

19  **THE INDIVIDUAL DEFENDANTS' MISCONDUCT
    DIRECTLY AND PROXIMATELY CAUSED DAMAGES TO ZILLOW**

20      170.    As a result of the Individual Defendants' improprieties, Zillow disseminated

21  improper public statements concerning Zillow's operations, prospects, and internal controls.  This

22  misconduct has devastated Zillow's credibility.

23      171.    As a direct and proximate result of the Individual Defendants' actions, Zillow has

24  expended, and will continue to expend, significant sums of money defending and paying any

25  settlement in the *Jaeger* Action.

26

27

**VERIFIED STOCKHOLDER
DERIVATIVE COMPLAINT**                         Page 53

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

172.    As a direct and proximate result of the Individual Defendants' actions as alleged above, Zillow's market capitalization has been substantially damaged, losing millions of dollars in value because of the conduct described herein.

173.    Lastly, the actions of the Individual Defendants have irreparably damaged Zillow's corporate image and goodwill.  For at least the foreseeable future, Zillow will suffer from what is known as the "liar's discount," a term applied to the stocks of companies that have been implicated in illegal behavior and have misled the investing public, such that Zillow's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

174.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

175.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct were, among other things, to (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

176.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with gross negligence to engage in improper accounting methods, conceal material facts, fail to correct such misrepresentations, and violate applicable laws.  In furtherance of this plan, conspiracy, and course of conduct, Individual Defendants collectively and individually took the actions set forth herein. The Individual Defendants described herein were direct, necessary, and substantial participants in

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

1  the common enterprise, and/or common course of conduct complained here because the action

2  described herein occurred under the authority and approval of the Board.

3         177.    Each of the Individual Defendants aided, abetted, and rendered substantial assistance

4  in the wrongs complained of herein.  In taking such actions to substantially assist the commission of

5  the wrongdoing complained of herein, each of the Individual Defendants acted with actual or

6  constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted

7  the accomplishment of that wrongdoing and was or should have been aware of his or her overall

8  contribution to and furtherance of the wrongdoing.

9         178.    At all times relevant hereto, each of the Individual Defendants was the agent of each

10  of the other Individual Defendants and the Company and was at all times acting within the course

11  and scope of such agency.

12  **PLAINTIFF HAS BEEN A STOCKHOLDER SINCE THE
ALLEGED WRONGDOING AND WILL FAIRLY AND ADEQUATELY
13  <u>REPRESENT THE COMPANY'S AND ITS STOCKHOLDERS' INTERESTS</u>**

14         179.    Plaintiff incorporates by reference and realleges each and every allegation set forth

15  above as though fully set forth herein.

16         180.    Plaintiff brings this action derivatively in the right and for the benefit of the Company

17  to redress the Individual Defendants' misconduct.

18         181.    Plaintiff is an owner of Zillow common stock and has been an owner of Zillow

19  common stock since the wrongdoing alleged herein.

20         182.    Plaintiff has hired counsel experienced in conducting derivative litigation and will

21  adequately and fairly represent the interests of the Company and its stockholders in enforcing and

22  prosecuting the Company's rights.

23

24

25

26

27

**VERIFIED STOCKHOLDER
DERIVATIVE COMPLAINT**
SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

## DEMAND IS FUTILE

### Each Director Defendant Faces a
### Substantial Likelihood of Personal Liability

183.    At the time Plaintiff commenced this action, the Board consisted of ten directors, Director Defendants: Barton, Blachford, Bohutinsky, Frink, Hoag, Maffei, Stephenson, Thielke and Underwood, and relevant non-party Gurley.  The Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

184.    The Director Defendants all face a substantial likelihood of liability for their individual misconduct.  The Director Defendants were directors throughout the time of the false and misleading statements and, as such, had a fiduciary duty to ensure the accuracy of the Company's SEC filings, press releases, and other public statements and presentations concerning Zillow's business, operations, prospects, internal controls, and financial statements.

185.    Moreover, the Director Defendants owed and owe a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective and were being implemented effectively, and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.  Instead, they knowingly and consciously reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

186.    Here, the Director Defendants failed to disclose that Zillow created a false and misleading impression that the growth of and demand for Zillow Offers was organic and based upon Zillow's frequently discussed and highlighted algorithm and pricing models and that Zillow Offers' favorable margins were the result of durable and sustainable operational and cost improvements.

187.    The Director Defendants also ignored red flags of the Officer Defendants' false and misleading statements in the form of publicly available analyses.  Such analyses asserted that Zillow was overriding its algorithm and overpaying for the homes purchased, creating a backlog in inventory as the resale velocity of the homes decreased.

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

188.    The Director Defendants face a substantial likelihood of personal liability because of their conscious and knowing authorization of false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective and were being implemented effectively, failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of the fiduciary duties of loyalty and good faith, for which the Director Defendants face a substantial likelihood of liability.

189.    If the Director Defendants were to bring a suit on behalf of Zillow to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  For this reason, Plaintiff's making a demand would be futile.

### The Audit Committee Defendants Face an Even Greater Likelihood of Personal Liability Than Other Directors

190.    The Audit Committee Defendants (Defendants Thielke, Maffei (Chair), and Stephenson), as members of the Audit Committee during the Relevant Period, participated in and knowingly approved the filing of false financial statements.  More specifically, as members of the Audit Committee, the Audit Committee Defendants were obligated to review the Company's annual and quarterly reports to ensure their accuracy.  Instead, the Audit Committee Defendants, as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process and its systems of internal accounting and financial controls and other financial information provided by the Company, as required by the Audit Committee Charter.  For this reason, demand is futile as to the Audit Committee Defendants.

### The Securities Class Action Defendants Face an Even Greater Likelihood of Personal Liability Than Other Directors

191.    The Securities Class Action Defendants on the Board (Defendants Barton, Parker, and Wacksman) face an even greater likelihood of personal liability that makes them incapable of considering a demand to remedy the wrongs alleged herein.  The Securities Class Action Defendants

VERIFIED STOCKHOLDER
DERIVATIVE COMPLAINT

Page 57

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

1   would be exposed to liability for violations of the federal securities laws and compromise their

2   defenses in the pending *Jaeger* Action.

3       192.    The Securities Class Action Defendants face a substantial likelihood of personal

4   liability and did not exercise disinterested business judgment in considering a demand to initiate and

5   prosecute this action.

6                          **Defendants Barton and Frink Lack Independence**

7       193.    Demand on Defendants Barton and Frink is futile because they are Co-Founders of

8   Zillow and have been sitting on the Board since 2004.  Indeed, the Company's 2024 Proxy Statement

9   did not designate them as independent directors.

10      194.    Barton and Frink met around the year 1991, when they both were students at

11  Standford University.  Since then, they have fostered a friendship and their family's vacation

12  together.

13      195.    In 1994, Barton was recruited by a mutual friend to join Frink at Microsoft

14  Corporation ("Microsoft").  Prior to founding the Company, Barton founded Expedia, Inc.

15  ("Expedia") as a group within Microsoft in 1994.  Microsoft spun out the group as Expedia in 1999,

16  and Defendant Barton served as Expedia's President, CEO, and as a member of its board of directors

17  from 1999 to 2003.

18      196.    From 1999 to 2004, Defendant Frink was at Expedia, where he held many leadership

19  positions, including Senior Vice President, Supplier Relations from 2003 to 2004, during which he

20  managed the air, hotel, car, destination services, content, merchandising, and partner marketing

21  groups.  From 1988 to 1999, Defendant Frink was at Microsoft, where he was part of the founding

22  Expedia team and a Group Program Manager from 1991 to 1995 and 1997 to 1999.

23      197.    Frink has served as a director on JustEatTakeAway.com (formerly known as

24  GrubHub Inc.) since 2013.  On November 15, 2010, GrubHub Inc. issued a press release titled

25  "GrubHub Secures $11 million in Investment Led by Benchmark Capital."  The 2022 Proxy

26

27

**VERIFIED STOCKHOLDER
DERIVATIVE COMPLAINT**

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

1  Statement stated that Barton served as a venture partner at Benchmark, a venture capital firm, from
2  February 2005 through September 2018.

3      198.    Accordingly, based on their longstanding personal and business relationship
4  Defendants Barton and Frink could not exercise independent business judgment in considering a
5  demand to investigate and prosecute this action.

6  **Barton, Blachford, Bohutinsky, Frink, Gurley, Hoag,**
7  **Maffei, Stephenson, Underwood, and Wacksman Lack Independence**

8      199.    Defendant Maffei lacks independence from Barton because they both have served as
9  members of the board of directors of Qurate Retail, Inc. ("Qurate"), since 2005 and 2016,
10  respectively.  Maffei is the Chairman of Qurate and owns 18.5% of Qurate's voting power.  Barton
11  received $147,031 in compensation during 2023 for his service as a director of Qurate.  Defendants
12  Maffei and Barton have a longstanding business and personal relationship and lack independence to
13  consider a demand for the Board to investigate and prosecute claims against one another.

14      200.    Defendant Hoag lacks independence from Barton because they both have served as
15  members of the board of directors of Netflix, Inc. ("Netflix") since 1999 and 2002, respectively.
16  Hoag is the Chair of Netflix's Nominating and Governance Committee, and in that position, he holds
17  significant control over Barton's status as a director of Netflix.  Barton and Hoag each received
18  $424,426 in option awards as compensation during 2023 for their  service as a directors of Netflix.

19      201.    Defendant Blachford lacks independence from Barton because they conduct
20  businesses outside the Company.  Per the 2024 Proxy Statement, Blachford and Barton co-own a
21  condominium.  Defendants Blachford and Barton have a longstanding business and personal
22  relationship and lack independence to consider a demand against the Board.

23      202.    Defendant Hoag is a co-founder of Technology Crossover Ventures ("TCV"), a
24  venture capital firm.  Per the 2024 Proxy Statement, Hoag is the founding general partner of TCV.

25      203.    Defendants Barton, Bohutinsky, Maffei, and Wacksman lack independence because
26  each of them has invested in various private equity and venture capital funds of TCV and have

27

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

1  longstanding personal and business relationships with each other and could not exercise independent

2  business judgment in considering a demand to investigate and prosecute claims against each other.

3       204.    Moreover, Bohutinsky, as a venture partner of TCV, may provide certain consulting

4  or other services to TCV for which she may receive indirect economic interests or value in certain

5  investments by TCV's affiliated investment funds.  Blachford also may provide consulting as an

6  executive advisor and venture partner of TCV and receive economic remunerations.  Defendants

7  Barton, Bohutinsky, Hoag, Maffei, and Wacksman thus have longstanding business and personal

8  relationships and, thus, lack independence to consider a demand on the Board to investigate and

9  prosecute claims against each other.

10      205.    Additionally, Defendant Bohutinsky served in various leadership positions at Zillow.

11  She served as the Company's COO from August 2015 until January 2019; Chief Marketing Officer

12  from March 2011 until August 2015; Vice President of Marketing and Communications from

13  September 2010 until March 2011; Vice President of Communications from August 2008 until

14  September 2010; and Director of Communications from August 2005 until August 2008.  Therefore,

15  she could not exercise independent business judgment in considering a demand to prosecute her co-

16  Defendants.

17      206.    Defendants Barton and Bohutinsky are not independent because they also served as

18  members of the board of directors of Avvo Inc. ("Avvo") from 2014 until 2018 when it was acquired

19  by Internet Brands Inc.  Accordingly, Barton could not exercise independent business judgment in

20  considering a demand for the Company to investigate and prosecute claims against Bohutinsky, and

21  she could not exercise independent business judgment of a demand for the Compay to investigate

22  and sue Barton.

23      207.    Blachford and Hoag have a further longstanding personal and business relationship

24  because they served as members of the board of directors of Peloton Interactive, Inc. ("Peloton").

25  Their time as directors of Peloton overlapped.  Blachford served as a director of Peloton from 2015

26  until February 5, 2022, and Hoag has served as a director of Peloton since 2018.  According to

27

**VERIFIED STOCKHOLDER**
**DERIVATIVE COMPLAINT**                    Page 60

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

Peloton's proxy statement filed with the SEC on October 22, 2024, entities affiliated with TCV hold 43.8% of Peloton's total voting power. Thus, Blachford and Hoag lack independence to consider a demand for the Company to assert claims against the other.

208.    Hoag and Maffei have a further longstanding personal and business relationship because they serve as members of the board of directors of TripAdvisor, Inc.'s ("TripAdvisor"). Thus, Defendants Hoag and Maffei could not exercise independent business judgment in considering a demand for the Company to investigate and prosecute claims against the other.

209.    Defendant Stephenson is Principal and Designated Broker of Real Property Associates, which participates in Zillow Group's Premier Agent and Listing Showcase programs. Because Defendant Stephenson derives a substantial source of income from his status as Zillow Group Premier Agent, he cannot exercise independent business judgment in considering demand. According to an article published by Inman, Stephenson accumulated $10 million in wealth from March 2014 through March 2015 by being a Zillow Premier Agent.[7]  According to the article, Stephenson "made an angel investment in [in Zillow] when it launched."  The article further notes that Defendant Stephenson "met Rich Barton through a Stanford classmate, Christian Acker, who was Barton's first hire at Zillow."  Defendant Stephenson has a longstanding business and personal relationship with Defendants Barton and Frink and, thus, cannot exercise independent business judgment in considering demand to investigate claims against them and approve the Company's prosecuting such claims.

210.    Defendant Underwood is not independent from Defendants Barton and Hoag. Defendant Underwood is Managing Director and Co-founder of Adverb Ventures, a venture capital firm, in which Defendants Barton and Hoag (through their family offices) are limited partners in various of the limited partnership funds.  Defendant Underwood has a longstanding business and

---

[7]  Brad Inman, How this Zillow Premier Agent made $10 million, Inman, March 5, 2015, https://www.inman.com/2015/03/05/how-this-zillow-premier-agent-made-10-million/ (last visited October 29, 2024).

VERIFIED STOCKHOLDER
DERIVATIVE COMPLAINT

Page 61

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

1   personal relationship with Defendants Barton and Hoag and, thus, cannot exercise independent

2   judgment in considering demand to investigate and sue them.

3      211.   Relevant non-party Gurley is not Independent from Barton and Frink.  Gurley is a

4   General Partner of Benchmark Capital, and is a direct or indirect, limited partner, or member of the

5   general partners of various venture capital funds of Benchmark Capital that have been invested in

6   by Defendants Barton and Frink.  Even though Defendant Barton's and Frink's capital commitments

7   in these funds represent a *de minimis* share of the total committed capital of the funds, Gurley is not

8   independent because he has a longstanding business and personal relationship with Defendants

9   Barton and Frink and, thus, could not exercise independent judgment in considering a demand a

10  demand to investigate and prosecute claims against them.

11     212.   Accordingly, based on their longstanding personal and business relationships Barton,

12  Blachford, Bohutinsky, Frink, Gurley, Hoag, Maffei, Stephenson, and Wacksman could not exercise

13  independent business judgment in considering a demand to investigate and prosecute this action.

## FIRST CAUSE OF ACTION

### Against the Individual Defendants
### <u>for Breach of Fiduciary Duties</u>

17     213.   Plaintiff incorporates by reference and realleges each and every allegation set forth

18  above as though fully set forth herein.

19     214.   Each Individual Defendant owed to the Company the duty to exercise candor, good

20  faith, and loyalty in the management and administration of Zillow's business and affairs.

21     215.   Each of the Individual Defendants violated and breached their fiduciary duties of

22  candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

23     216.   The Individual Defendants' conduct set forth herein was due to their intentional or

24  reckless breach of the fiduciary duties they owed to the Company, as alleged herein.  The Individual

25  Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the

26  rights and interests of Zillow.

27

**VERIFIED STOCKHOLDER**
**DERIVATIVE COMPLAINT**

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

217.   In breach of their fiduciary duties, the Individual Defendants caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, inter alia, that (i) between the first and second quarter of 2021, the Company initiated Project Ketchup in order to accelerate the purchase of homes so that Zillow could achieve its 3-to-5-year volume goals of purchasing monthly 5,000 homes and achieving $20 billion in revenue, (ii) in an attempt to attain volume goals the Company was overriding the offer prices generated by its algorithm and analysts pricing value models, thereby Zillow was overpaying for homes in order to entice sellers to sell their homes to the Company, (iii) Zillow was reducing the scope of renovations and budget to pay for such renovations and contractors, (iv) as a result of the renovation cost-cutting and the contractor shortages, the Company had a backlog in inventory causing the houses to sit in inventory longer and increasing carrier costs, and (v) consequently, as a result of the foregoing, the Company had to wind-down its inventory and sell the properties at well below purchase price.  The Individual Defendants failed to disclose that Zillow created a false and misleading impression that the growth of and demand for Zillow Offers was organic and based upon Zillow's frequently discussed and highlighted algorithm and pricing models and that Zillow Offers' favorable margins were the result of durable and sustainable operational and cost improvements.

218.   The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

219.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements.  The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them.  Such

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

1    material misrepresentations and omissions were committed knowingly or recklessly and for the

2    purpose and effect of artificially inflating the price of the Company's securities.

3        220.    The Individual Defendants had actual or constructive knowledge that they had caused

4    the Company to improperly engage in the fraudulent schemes set forth herein, and that internal

5    controls were not adequately maintained, or acted with reckless disregard for the truth, in that they

6    caused the Company to improperly engage in the fraudulent schemes and fail to maintain adequate

7    internal controls, even though such facts were available to them.  Such improper conduct was

8    committed knowingly or recklessly and for the purpose and effect of artificially inflating the price

9    of the Company's securities.  The Individual Defendants, in good faith, should have taken

10   appropriate action to correct the schemes alleged herein and to prevent them from continuing to

11   occur.

12       221.    These actions were not a good-faith exercise of prudent business judgment to protect

13   and promote the Company's corporate interests.

14       222.    As a direct and proximate result of the Individual Defendants' breaches of their

15   fiduciary obligations, Zillow has sustained and continues to sustain significant damages.  As a result

16   of the misconduct alleged herein, the Individual Defendants are liable to the Company.

17                              **SECOND CAUSE OF ACTION**

18                    **Against the Securities Class Action Defendants**
     **for Contribution under Sections 10(b) and 21D of the Exchange Act and SEC Rule 10b-5**
19

20       223.    Plaintiff incorporates by reference and realleges each and every allegation set forth

21   above as though fully set forth herein.

22       224.    Zillow along with the Securities Class Action Defendants (Barton, Parker, and

23   Wacksman) are named as defendants in the *Jaeger* Action, which asserts claims under the federal

24   securities laws for violations of Sections 10(b) and 21D of the Exchange Act and SEC Rule 10b-5.

25   If the Company is found liable in the Securities Class Action for these violations of the federal

26   securities laws, the Company's liability will be in whole or in part due to the Securities Class Action

27

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

1   Defendants' willful and/or reckless violations of their obligations as officers and/or directors of

2   Zillow.

3       225.    Because of their positions of control and authority as officers and/or directors of

4   Zillow, the Securities Class Action Defendants were able to and did, directly and/or indirectly,

5   exercise control over the business and corporate affairs of the Company, including the wrongful acts

6   complained of herein and in the *Jaeger* Action.

7       226.    Accordingly, the Securities Class Action Defendants are liable under Section 10(b)

8   of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, which create an implied private right

9   of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which

10  governs the application of a private right of action for contribution arising out of violations of the

11  Exchange Act.

12      227.    As such, Zillow is entitled to receive all appropriate contribution or indemnification

13  from the Securities Class Action Defendants.

**THIRD CAUSE OF ACTION**

14

15  **Against the Individual Defendants**
    **for Violation of Section 20(a) of the Exchange Act**

16

17      228.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth

18  above, as though fully set forth herein.

19      229.    The Individual Defendants, by virtue of their positions with Zillow and their specific

20  acts, were, at the time of the wrongs alleged herein, controlling persons of Zillow and officers and

21  directors who made the false and misleading statements alleged herein within the meaning of Section

22  20(a) of the Exchange Act.  The Individual Defendants had the power and influence, and exercised

23  same, to cause Zillow to engage in the misconduct and practices complained of herein.

24

25

26

27

**VERIFIED STOCKHOLDER**
**DERIVATIVE COMPLAINT**

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

**FOURTH CAUSE OF ACTION**

**Against the Individual Defendants**
**for Unjust Enrichment**

230.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

231.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Zillow.

232.    The Individual Defendants benefitted financially from the improper conduct, received unjust lucrative bonuses tied to the false and misleading statements, and received bonuses, stock options, or similar compensation from Zillow that was tied to the performance or artificially inflated valuation of Zillow, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct, or sold stock at artificially inflated prices during the Relevant Period.

233.    Plaintiff, as a stockholder and representative of Zillow, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants from their wrongful conduct and breach of their fiduciary duties.

234.    Plaintiff on behalf of Zillow has no adequate remedy at law.

**FIFTH CAUSE OF ACTION**
**Against All of the Individual Defendants**
**for Aiding and Abetting**

235.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

**VERIFIED STOCKHOLDER**
**DERIVATIVE COMPLAINT**

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

236.    Each of the Individual Defendants acted and is acting with knowledge of, or with disregard to, the fact that the Defendants are in breach of their fiduciary duties to Zillow and has participated in a conspiracy in breach of fiduciary duties.

237.    In committing the wrongful acts alleged herein, each of the Individual Defendants has pursued, or joined in the pursuit of, a common course of conduct.  The Individual Defendants have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided, abetted, and assisted each other in breaching their respective duties.

238.    The Individual Defendants collectively and individually initiated and followed a course of conduct that violated the federal securities laws; authorized corporate actions to serve their own personal interests rather than the interests of the Company and its stockholders; misrepresented material facts about the Company, its financial condition, and business prospects; prevented the disclosure of material information necessary to make statements complete and accurate; and failed to implement and maintain an adequate system of internal controls and corporate governance practices.

239.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, including violations of the federal securities laws and breaches of fiduciary duty.

240.    Each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and common course of conduct complained of herein.

241.    Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and were aware of their overall contributions to and furtherance of the wrongdoing.

1

2

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

3        A.      Declaring that Plaintiff may maintain this derivative action on behalf of Zillow and

4    that Plaintiff is a proper and adequate representative of the Company;

5        B.      Declaring that the Individual Defendants have breached their fiduciary duties to

6    Zillow;

7        C.      Determining and awarding to Zillow the damages sustained by it because of the

8    violations set forth above from each of the Individual Defendants, jointly and severally, together

9    with pre- and post-judgment interest thereon;

10       D.      Directing Zillow and the Individual Defendants to take all necessary actions to reform

11   and improve its corporate governance and internal procedures to comply with applicable laws and

12   protect Zillow and its stockholders from a repeat of the damaging events described herein;

13       E.      Awarding Zillow restitution from the Individual Defendants;

14       F.      Awarding Zillow prejudgment interest;

15       G.      Granting appropriate equitable relief to remedy the Individual Defendants' breaches

16   of fiduciary duties and other violations of law;

17       H.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable

18   attorneys' fees, accountants' and experts' fees and costs and expenses; and

19       I.      Granting such other and further relief as the Court may deem just and proper.

20

## **JURY TRIAL DEMANDED**

21   Plaintiff hereby demands a trial by jury.

22   Respectfully Submitted: October 31, 2024.

23

SCHLEMLEIN FICK & FRANKLIN, PLLC

24

 */s/ Michael P. Scruggs*

25   Michael P. Scruggs, WSBA No. 19066

26    */s/ Colleen A. Lovejoy*

27

**VERIFIED STOCKHOLDER**          Page 68          SCHLEMLEIN FICK & FRANKLIN, PLLC
**DERIVATIVE COMPLAINT**                            66 S. Hanford Street, Suite 300
                                                    Seattle, WA 98134
                                                    P: (206) 448-8100 F: (206) 448-8514

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Colleen A. Lovejoy, WSBA No. 44386
SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford St, Suite 300
Seattle, WA  98134
P: 206-448-8100
F: 206-448-8514
E: MPS@soslaw.com
E: C.Lovejoy@soslaw.com
Attorneys for Plaintiff


**BRAGAR EAGEL & SQUIRE, P.C.**
(Applications for leave to appear
pro hac vice are forthcoming)

*s/ Badge Humphries*
Badge Humphries
humphries@bespc.com
BRAGAR EAGEL & SQUIRE, P.C.
2113 Middle Street, Suite 305
Sullivan's Island, SC 29482
Telephone:  (843) 883-7444

*s/ Gabriela A.Cardé*
Gabriela A. Cardé
carde@bespc.com

*s/ Casey C. DeReus*
Casey C. DeReus
dereus@bespc.com
BRAGAR EAGEL & SQUIRE, P.C.
810 Seventh Avenue, Suite 620
New York, NY 10019
Telephone:  (212) 308-5858
Fax: (212) 486-0462

**VERIFIED STOCKHOLDER
DERIVATIVE COMPLAINT**

SCHLEMLEIN FICK & FRANKLIN, PLLC
66 S. Hanford Street, Suite 300
Seattle, WA 98134
P: (206) 448-8100 F: (206) 448-8514

## VERIFICATION

I, David Dykhouse, declare that I have reviewed the Verified Stockholder Derivative Complaint ("Complaint") prepared on behalf of Zillow Group, Inc., and authorize its filing. I have reviewed the allegations made in the Complaint, and as to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and, for that reason, believe them to be true. I further declare that I am a current holder of Zillow Group, Inc. stock and have continuously held Zillow Group, Inc. stock from the time of the wrongdoing alleged herein until the present. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 30 day of October 2024.

David Dykhouse (Oct 30, 2024 16:00 MDT)

David Dykhouse

# 20241030_Zillow Group, Inc_Verification-Dykhouse

Final Audit Report                                               2024-10-30

| | |
|---|---|
| Created: | 2024-10-30 |
| By: | Anthony Bowling (bowling@bespc.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAADyL13ZuE_TCU32w1vW9p53cJ-T1QvZ5O |

## "20241030_Zillow Group, Inc_Verification-Dykhouse" History

📄 Document created by Anthony Bowling (bowling@bespc.com)
   2024-10-30 - 9:56:43 PM GMT- IP address: 38.132.137.197

📧 Document emailed to ddykho71@yahoo.com for signature
   2024-10-30 - 9:57:07 PM GMT

📄 Email viewed by ddykho71@yahoo.com
   2024-10-30 - 9:59:36 PM GMT- IP address: 104.28.48.213

✍ Signer ddykho71@yahoo.com entered name at signing as David Dykhouse
   2024-10-30 - 10:00:19 PM GMT- IP address: 67.162.148.149

✍ Document e-signed by David Dykhouse (ddykho71@yahoo.com)
   Signature Date: 2024-10-30 - 10:00:21 PM GMT - Time Source: server- IP address: 67.162.148.149

✔ Agreement completed.
   2024-10-30 - 10:00:21 PM GMT